Rosemary Oelrich **BOTTCHER**, etc.,
Plaintiff,

v.

**STATE OF FLORIDA DEPARTMENT
OF AGRICULTURE AND CONSUMER
SERVICES et al., Defendants.**

**Civ. A. No. 1848.**

United States District Court,
N. D. Florida,
Tallahassee Division.

Aug. 6, 1973.

Jon D. Caminez, Tallahassee, Fla., for plaintiff.

Robert A. Chastain, Gen. Counsel, State of Fla. Dept. of Agriculture and Consumer Services, Tallahassee, Fla., for defendant.

## OPINION–ORDER

MIDDLEBROOKS, District Judge.

### PRELIMINARY STATEMENT OF ACTION

In this action for injunctive relief, plaintiff, a female employee of the State of Florida, seeks to enjoin defendants, her employer and immediate supervisors, from certain alleged retaliatory conduct against her as the result of plaintiff's exercise of a fundamental civil right during the course of her employment, the exercise of this right which is alleged to find protection within the First and Fourteenth Amendments of the United States Constitution. It is thereafter alleged in the complaint and amended complaint that by assigning plaintiff to other duties within the defendant department without first providing her with opportunity for a hearing to contest defendant's administrative action she has suffered diminution of a substantial property right at the hands of defendants and has thus been deprived of substantive and procedural due process. This action was commenced under Title 42, United States Code, Section 1983 and jurisdiction is invoked pursuant to Title 28, United States Code, Sections 1331 and 1343(3); in this proceeding plaintiff seeks back pay, expunction of certain documents in her personnel file, restoration to a non-conditional personnel rating and an award of a full merit increase of 5% in lieu of the 2½% increase given her by defendants.

Having considered pleadings, affidavits, exhibits and the pre-trial stipulation entered into by the parties and sub-

mitted to this Court in this cause, having considered the demeanor of the witnesses who have testified and having resolved the credibility choices to be made, this Court makes the following findings of fact and conclusions of law as may be required by Rule 52(a), Federal Rules of Civil Procedure:

## FINDINGS OF FACT

■ Plaintiff, a Florida resident, was employed by the State of Florida Department of Agriculture as a Chemist I in its Pesticide Residue Laboratory (PRL) in Tallahassee, Florida, at the time this cause of action arose. Plaintiff commenced her duties with the Division of Chemistry on September 2, 1969. In November, 1969, she was assigned to PRL where she continued to be employed until June 5, 1972, at which time she was assigned to the fertilizer laboratory. In the course of her employment as a chemist, plaintiff tested and analyzed agricultural products for the presence of pesticides.

■ Defendant Department of Agriculture and Consumer Services, hereinafter referred to as the Department, is a duly designated agency of the State of Florida. As authorized by statutes and laws of Florida, it employs personnel to examine foodstuffs and products and to conduct chemical tests at the PRL to determine if these products, to be ultimately used by the public consumer, are contaminated beyond safe levels with residues of certain toxic pesticides. The other individually named defendants administer and formulate the policies and practices of the defendant Department and supervise the personnel hired by the Department to implement these programs promulgated and established by the laws of Florida.

■ Testimony discloses that beginning in 1968, it was defendants' policy to evaluate annually the performance of each of its employees and to determine and rate his or her level of performance.

■ Prior to August 28, 1972, this plaintiff had received satisfactory performance ratings from defendants and had been given 5% merit increases as authorized by Florida law.

## EVENTS PRIOR TO
## MAY 11, 1972

■ In the latter part of March, 1972, or the first part of April, 1972, an interdepartmental rift between the defendant Department and Department of Pollution Control began to surface relative to the aerial application of Mirex, a chlorinated hydrocarbon pesticide, used in the control of fire ants.

■ During this period of controversy and continuing to present, plaintiff's husband was employed as an attorney for the Department of Pollution Control.

■ On April 14, 1972, the Pollution Control Board (PCB) informed the defendant Department that it should thereafter apply for a permit to make aerial application of Mirex for fire ant control. Disenchanted with this administrative edict the Department filed suit against PCB in the Circuit Court in and for Leon County, Florida, for declaratory decree challenging that body's authority to require the defendant Department to apply for a permit to make aerial application of Mirex for fire ant control. Necessarily involved in that litigation was whether the aerial application of Mirex constituted a potential source of pollution.

■ Prior to commencement of the action in state court, plaintiff lunched with her husband and another attorney employed by PCB, at which meeting Mirex became a topic of discussion. During the discussion plaintiff explained that the Department had adequate screening procedures for the detection of toxic substances at or above tolerance levels.

■ After the commencement of the foregoing declaratory action, the defendant Golden asked an employee (other than plaintiff) in the PRL to prepare chromatographs of two standard pesticide solutions containing Mirex. These

results were turned over to defendant Golden later that same day. About this same time and perhaps shortly prior thereto, plaintiff initiated independent research to determine whether the presence of Mirex could be detected under normal screening procedures. The first of plaintiff's chromatographs was prepared on April 21, 1972, and a subsequent set was prepared on May 1, 1972.

■ Plaintiff stated that she did not begin her own tests until she had first observed the results that her co-worker had obtained on those solutions tested at the instruction of defendant Golden. It was her testimony that upon observing her co-worker she noticed that it was necessary to adjust the sensitivity of the gas chromatograph so that it was twice as sensitive as it was during the normal course of operating procedures. She then decided to conduct her own tests in order to confirm her suspicions, viz., that defendants' detection devices could not find Mirex at normal tolerance levels. It is this portion of plaintiff's testimony which is hotly contested by defendants. This much is undisputed however: during one of the tests run by plaintiff one of her co-workers assisted her to some degree in her endeavors and from the result of the tests run on May 1, 1972, plaintiff's suspicions were verified. It was not until May 11, 1972, during the taking of his deposition by attorneys for PCB in the state court litigation that defendant Golden learned that there were some possible deficiencies in the testing procedures in his Department. This revelation occurred as a result of plaintiff making known her findings to her immediate supervisor.

■ During this same time period, but prior to the taking of the defendant Golden's deposition, plaintiff surrendered the chromatographs which she had prepared, to her husband who in turn revealed their content to the attorney representing the PCB in the state court proceedings. On or about this same time this attorney visited the PRL and plaintiff, among others, explained the operating procedures in the laboratory. This visitor was also permitted to observe operation of the gas chromatograph. Additionally, plaintiff advised this attorney during this interval that an earlier statement relative to detection in the PRL of toxic substances was not totally correct in light of her most recent findings with respect to Mirex.

### EVENTS OF MAY 11, 1972

■ On the morning of May 11, 1972, the PCB attorney deposed the defendant Golden in preparation for the state court proceedings instituted by the defendant Department.

■ Defendant Golden, unaware at that time of plaintiff's findings and the fact that these had been communicated to the PCB attorney, testified upon examination that Mirex could be detected by the equipment in use at the PRL under normal operating procedures. During the lunch break on that date the PCB attorney encountered plaintiff and confronted her with the question whether she had represented to him that Mirex could not be detected by the equipment at defendants' laboratory. Upon being informed as to what had transpired during the taking of defendant Golden's deposition, plaintiff replied that defendant Golden must have been "mistaken."

■ Upon returning to PRL, plaintiff informed some of her co-workers of the results of the tests she had made and that the statements of defendant Golden made at the deposition hearing were in error. One of the co-workers to whom these remarks were made was plaintiff's immediate supervisor who in turn made certain that defendant Golden was apprised of these revelations. Later that same afternoon when the taking of depositions resumed, defendant Golden explained to counsel that some of his testimony given earlier that day may have been in error.

■ When queried at trial as to why she had not informed her superiors sooner or before May 11, 1972, as to

possible deficiencies in the screening procedures at PRL, plaintiff stated she had been under the mistaken belief that her superiors knew or were aware of the insensitivity of the chromatograph machine. Plaintiff also stated that in the aftermath of subsequent events she realized that she had exercised "poor judgment" in not revealing to her superiors her findings sooner.

■ Following the deposition hearing the PCB attorney was asked by the defendant Golden and his attorney the source of his information relative to the shortcomings in the detection equipment at PRL and he replied that the plaintiff Bottcher had supplied him with this information.

■ The defendant Department did not have at the time of the incident which forms the subject matter of this action any rule or regulation which specifically dealt with and governed the release to third parties of technical information of the nature of the matter in suit. The defendant Department, however, had issued to all supervisory personnel and employees a written statement of policy governing disclosure of information, which is recited in pertinent part as follows:

> "Your work in the Department may quite often give you access to information * * * which, by its nature should be treated as confidential and not discussed outside or inside the office. We hope your personal discretion will enable you to judge which information should be considered as confidential. It is wise also not to repeat items which though not confidential, could be considered as gossip. It should be remembered, however, that we are a State Agency, and our records are open to the public."
>
> \* \* \* \* \* \*
>
> "Request for information generally should be referred to your Division Director or personnel designated by him to handle such matters."

It is undisputed that this policy was in force and effect at the time the disclosures were made by plaintiff and that she and the recipient of same had not followed the suggested administrative channels in disseminating this information. It is also undisputed that the findings of plaintiff had not been verified by her superiors prior to the release of these findings to PCB. It is also not clear from the evidence if the findings have since been verified.

## EVENTS AFTER
## MAY 11, 1972

■ Subsequent to the happenings previously described, plaintiff was moved on June 12, 1972, to the fertilizer laboratory as a Chemist I, retaining the same rate of pay she had previously enjoyed while at PRL.

■ On that same date by letter to defendant Conner, plaintiff voiced her disapproval of being relocated. At the same time she made a similar protestation to defendant Golden. At trial the defendant Golden testified that he thought that plaintiff's disclosures influenced him in requesting that she be transferred to the fertilizer laboratory even though there were other factors which allegedly necessitated reshuffling of personnel at PRL.

■ Thereafter, plaintiff appealed to the Florida Career Service Commission, complaining to this body that her transfer and "demotion" were prompted by her disclosures relative to Mirex and that she was entitled to be restored to her former location. At trial it was developed that this appeal was denied on a jurisdictional bases since it was determined that under state law plaintiff was not entitled to appeal defendants' decision to move her to the fertilizer laboratory. Section 22A–10.05(a), Personnel Rules and Regulations, provides in part as follows:

> "A. An employee who has earned permanent status in the Career Service in accordance with the provisions of Section 22A–7.08 shall have the right to appeal to the Career Service Commission any suspension, reduction in pay, transfer, layoff, demotion, or dismissal by the agency or officer by whom he is employed . . . ."

It was explained that the complained of action did not fit into any of the enumerated review categories.

This action ensued in this Court on July 27, 1972. A short time thereafter, plaintiff was given a conditional rating which was signed by defendants Golden and Stewart. Annexed to this document was a letter of defendant Stewart used as a documented account of specific acts of misconduct on part of plaintiff which ostensibly warranted her conditional rating. No mention was made of the incidents involving Mirex. Prior to this time, i. e., in her preceding years of employment with defendants, plaintiff had never received a conditional rating.

While this conditional rating was in force and effect, plaintiff was not eligible and did not receive any merit increases. Thereafter, the conditional rating was lifted and plaintiff was given a satisfactory rating.

At the time plaintiff's rating was changed to satisfactory, plaintiff was given a merit increase of 2½%, although other employees who worked with her at PRL received the maximum 5% merit increases. In previous years plaintiff had been awarded a full 5% merit increase as had the other chemists.

The Court is dissatisfied that there is factual basis for plaintiff's conditional rating as alleged in the reports and letters of defendants recommending this course of action. The precipitating cause of defendants' actions clearly was plaintiff's disclosure of technical information to third parties before she had apprised defendants themselves of such matter. Any references in reports or letters of defendants to specific acts of misconduct on part of plaintiff in the performance of her duties are not borne out by this record. The only truly actionable conduct of plaintiff while employed at PRL was her impolitic disclosure of technical data, which conduct was not cited by defendants as the basis for their action.

The transfer of plaintiff to the fertilizer laboratory did not result in the diminution of vocational duties and responsibilities or entail performance of lesser duties which were not commensurate with her professional training and background. Although her current position at the fertilizer laboratory may not be as intellectually stimulating as her former position at PRL, it is by no means a position which offers no hope for occupational advancement. Thus, this Court need not decide whether this reassignment standing singularly deprived plaintiff of any due process rights.

This Court finds it unnecessary to determine whether plaintiff's ill-advised disclosure of information would have constituted grounds for the conditional rating as this was not cited as a reason for the rating.

The letters of defendant Stewart previously referred to as being unsupported by any substantial factual basis, in their present form constitute an impediment on plaintiff's road to future success and advancement and to her professional reputation and these should be removed through legal engineering techniques.

## CONCLUSIONS OF LAW

This Court has jurisdiction over the subject matter of and the parties to this action. Title 28, United States Code, Sections 1343(3) and 1331; Title 42, United States Code, Section 1983.

The primary issue for determination as framed by plaintiff's amended complaint is whether defendants' collective conduct has deprived her of adequate procedural safeguards. Inextricably entwined with this issue is the subsidiary issue whether defendants in reliance upon state rules and regulations governing employee conduct have impinged upon plaintiff's right to expression guaranteed under the First and Fourteenth Amendments of the United States Constitution.

It has long been a rule of constitutional law not to consider the con-

stitutionality of state legislation or state agency regulation unless it is imperatively required. Bush v. Texas, 372 U.S. 586, 83 S.Ct. 922, 9 L.Ed.2d 958 (1963). More pertinent to this cause is the general rule that courts will not pass on the constitutionality of an act of a state legislature or rule of a state agency if the merits of the case may be fairly determined otherwise. Thus, if the case may be decided on either of two grounds and one does not involve constitutional construction of a statute, then the Court will ordinarily decide it on that ground. See Benton-Volvo-Metairie, Inc., et al v. Volvo Southwest, Inc. et al, 479 F.2d 135 at 137, 5th Cir. 1973. Consequently, this Court because of the form of the relief requested and the decision to be rendered, need not decide the First Amendment issue posited by plaintiff's amended complaint although necessarily the Court may approach at times the periphery of this issue.

■ Relative to plaintiff's procedural due process contentions, defendants counter with the recent authority of Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The Court finds this authority persuasive, if not controlling, but not in the context urged on this Court by defendants.

■ As previously noted, plaintiff was denied an appeal since under Florida law her reassignment did not fall within any particular review category. The mere fact that state law may not have designated defendants' action resulting in plaintiff's reassignment in the case *sub judice* as a recognizable appealable form of agency action, does not end this Court's inquiry here.

■ [4] *Roth*, supra, concluded that requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. In determining the form of hearing, if any, required by due process standards, the courts have been required to look at the nature of the interest at stake. *Roth*, supra, 408 U.S. at 571, 92 S.Ct. 2701. In this vein *Roth*, supra, made clear that " 'property interests' subject to procedural due process protection are not limited by a few rigid technical forms." Perry v. Sindermann, supra, 408 U.S. at 601, 92 S.Ct. at 2699. In examining the petitioner Roth's claims in light of those principles of law fashioned by the Court, the writer observed that in that case "there is no suggestion whatever that the respondent's interest in his 'good name, reputation, honor, or integrity' is at stake." *Roth*, supra, 408 U.S. at 573, 92 S.Ct. 2701. In the case *sub judice* there are specific allegations made by plaintiff to this effect. Additionally, in *Roth* the writer found that "there is no suggestion that the State * * * imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." *Ibid.* Plaintiff's very argument in the instant action is that the letters of defendant Stewart placed in her personnel file have foreclosed or diminished her opportunities for occupational advancement and as such constitute a distinct threat to a protected property interest to which the protections of due process apply. Compare also, Thompson et al v. Madison County Board of Education, 476 F.2d 676, 5th Cir. 1973 [March 13, 1973]. By the same token, the mere relocation of plaintiff within the defendant Department, without more, would not amount to a showing of a loss of liberty or loss of a property right. See e. g. Perry v. Sindermann, supra, 408 U.S. at 599, 92 S.Ct. 2694.

■ In light of the recent formidable authority referred to, this Court can only conclude that plaintiff was not afforded full and adequate procedural safeguards by defendants. This conclusion does not necessarily mandate remand to the administrative agency for a plenary hearing since plaintiff has been accorded a *de novo* hearing in this Court in which all pertinent historical fact has been fully developed; thus, the possible procedural deficiencies which existed in

the prior administrative proceedings are mooted. Flüker v. Alabama State Board of Education, 441 F.2d 201 (5th Cir. 1971); Ferguson v. Thomas, 430 F.2d 852 (5th Cir. 1970).

■ Plaintiff's constitutional dilemma is not eased by this conclusion. Some affirmative action is required by this Court in order to undo any injustices done to her in the process of her reassignment to the fertilizer laboratory and during events which thereafter followed. Ordinarily, findings and decisions of administrative bodies are to be upheld by the courts when reached by correct procedures and supported by substantial evidence. Green v. Board of Regents of Texas Tech University, 474 F.2d 594, 5th Cir. 1973. Necessarily, this rule of law presupposes that the aggrieved party was afforded some semblance of a hearing before action was taken against him or her. Because of the *de novo* hearing in this Court the initial phase of that rule is satisfied; it is the latter portion of that rule to which the Court must now inquire.

■ The Court has found that the precipitating cause of plaintiff's reassignment to the fertilizer laboratory was her unapproved, voluntary disclosure of technical information to the PCB attorney; this conduct was not cited in plaintiff's personnel record as the primary cause for the action taken. Rather, defendants sought to recite in support of their action to place her on a conditional rating and to give her a 2½% merit increase, specific instances of poor or sub-par performances by plaintiff while on the job as well as other incidents where it was alleged that plaintiff had caused disruption at the jobsite. These incidents allegedly stretched back to 1969, when plaintiff first began work with defendants. These allegations were easily refuted through testimony of plaintiff's co-workers and could not be convincingly established by defendants' witnesses. The record is thus barren of any substantial evidence which would support the conditional rating given plaintiff. The Court must conclude that this action of defendants was retaliatory

in nature and constituted arbitrary action on their part which denied plaintiff substantive due process as well as procedural due process of law.

■ Relative to the merit increase given plaintiff, defendants argue that plaintiff suffered no impingement upon her rights to due process since the award of an annual merit increase was a permissive gesture on part of the state employer and state employees had no certain expectancy to receipt of same. This argument approaches the central issue involved in Perry v. Sindermann, supra, wherein the Supreme Court disapproved of the Fifth Circuit's notion that a "subjective expectancy" of employment or promotion would invoke the protections of due process; however, the Supreme Court noted that this claim of such entitlement could be legitimized in light of the policies and practices of the particular employer institution.

It was shown at trial that plaintiff as well as her other co-workers had customarily received full 5% annual merit increases upon their receipt of a satisfactory performance rating. In the year 1972, her co-workers who had not otherwise received a promotion and pay increase, received the customary 5% merit increase; that is, all except plaintiff who received only a 2½% increase even though her conditional rating had been transformed to a satisfactory rating.

■ This Court finds that under the circumstances present in this case, especially the poor judgment of plaintiff in disseminating unverified information, that the defendants were justified in not awarding plaintiff the maximum merit increase and this action of defendants shall not be disturbed.

■ At this point the Court deems it necessary to digress momentarily from the mainstream of decision in this cause and to consider the argument of defendants, which although unaccepted by the Court, is nonetheless deemed plausible in light of circumstances found present.

■ Simply explained, defendants' position is that their action taken against plaintiff following her untimely

disclosure of technical data to third parties, constituted nothing more than disciplinary action against a disobedient or disloyal employee and in this manner was a valid exercise of their right to police their employees; therefore, plaintiff's conduct, albeit approaching a symbolic First Amendment activity, would not be transformed into protected free speech, the exercise of which would override the defendants' paramount interest in maintaining order and discipline among its numerous employees and vouchsafing the sanctity of confidential information assembled by them. In this respect defendants seek to avail themselves of the balancing of rights test suggested in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). See also Duke v. North Texas State University, 469 F.2d 829, 5th Cir. 1972.

On occasion this Court has recognized the clear need of a public employer to maintain order and discipline among its employees in order to promote orderly performance of services rendered to the public. See e. g. Parker v. Graves, 340 F.Supp. 586 (N.D.Fla.1972); aff'd 479 F.2d 335, 5th Cir. 1973; London v. Florida Department of Health and Rehabilitative Services, etc., 313 F.Supp. 591 (N.D.Fla.1970), aff'd 448 F.2d 655 (5th Cir. 1971). If this were a case where vital state interests were imperilled by the conduct of the plaintiff employee and the necessary action taken against her were borne out and supported by a substantial factual basis, then the Court's rendering in this cause might be altogether different; but the record here presented simply does not absolve defendants of the action taken against plaintiff insofar as the conditional rating is concerned. Compare *London*, supra., 448 F.2d at 658.

### CAVEAT PUBLICAE

 [7] In order that this decision not be misconstrued this Court is constrained to include the following remarks. The basis of decision does not rest upon enlargement of First Amendment principles. The fact that plaintiff was exercising a claimed First Amendment right does not cloak her conduct in a veil of absolute privilege. It is true that public employees do not shed their right to freedom of expression once they enter the domain of public service; it is equally true that not all forms of expression by public servants are protected free speech.

In the case, *sub judice*, plaintiff through her scientific inquisitiveness may have made a discovery of no little magnitude and of vital importance to citizens of Florida when she uncovered the shortcomings in the testing procedures in the laboratory where she was employed. Be that as it may plaintiff cannot be excused for her failure to report promptly her findings to her superiors. Her dilatory conduct, whether as the result of intentional connivance or as the result of exercise of poor judgment, should not have been condoned. The results of plaintiff's unverified scientific endeavors could have been a source of great public embarrassment to defendants. Due to the sensitive nature of the operations of defendants' laboratories, the Court can understand defendants' contentions of strict adherence to their written rules governing disclosure of information. Without hesitation or reservation this Court can perceive the obvious reasons for such necessary measures. Thus, so long as these rules are reasonably applied, no constitutional encroachment on the rights of employees should result. The sum and substance of this discourse is to make clear that public employees and individuals should not use today's decision as a springboard for tomorrow's assertion that they are provided *carte blanche* rights to speak out on whatever they may choose and wherever they choose.[1] This decision is not intended to provide any public employee with the unbridled license to express himself on matters of internal op-

1. Compare Moore v. Winfield City Board of Education, 452 F.2d 726, 728 (5th Cir. 1971); Murray v. West Baton Rouge Parish School Board, 472 F.2d 438, 5th Cir. 1973.

erations committed initially to the discretion of his superiors. Such an argument would be unavailing.

Continuing further into the issues, however, the Court finds that the exercise of plaintiff's First Amendment rights does not collide headlong with defendants' actions taken against her and it is thus unnecessary to meet this issue squarely and to reconcile the rights of the parties in light of the First Amendment.

Accordingly, it is

Ordered and adjudged;

■ The defendants shall forthwith expunge from records pertaining to plaintiff the conditional rating awarded plaintiff together with the letters accompanying the conditional rating.

■ The request for mandatory relief with respect to the merit increase is denied.

■ Each party shall bear each party's own costs and fees incurred herein.