Stanley C. MAZALESKI, Appellant,

v.

Dale H. TREUSDELL, Individually and in his capacity as Director, Commissioned Personnel Operations Division, Public Health Service Department of Health, Education and Welfare, et al.

No. 75–1817.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 13, 1976.

Decided April 26, 1977.

Rehearing Denied June 27, 1977.

Christopher M. Reuss, San Francisco, Cal., of the bar of the District of Columbia Court of Appeals, pro hac vice, by special leave of court, with whom Floyd J. Kops, New York City, and James McConville, New York City, were on the brief, for appellant.

Andrea L. Harnett, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry, and Paul M. Tschirhart, Asst. U. S. Attys., Washington, D. C., at the time the brief was filed were on the brief, for appellee.

Before BAZELON, Chief Judge, and TAMM and ROBB, Circuit Judges.

Opinion for the Court filed by TAMM, Circuit Judge.

Concurring Opinion filed by ROBB, Circuit Judge.

Opinion filed by BAZELON, Chief Judge, concurring in part and dissenting in part.

TAMM, Circuit Judge:

This appeal raises various constitutional challenges to the involuntary termination of a federal employee unprotected by our civil-service laws. The district court dismissed the employee's complaint seeking in-

junctive and declaratory relief after the submission of affidavits and a brief hearing. Treating the district court's disposition as an award of summary judgment for the government, we reverse for the reasons discussed below.

## I. BACKGROUND

### A. *Generally*

From August 13, 1973, until his involuntary termination on July 10, 1975, our appellant, Stanley C. Mazaleski, was a Reserve Commissioned Officer in the United States Public Health Service (Service or PHS). Hired as a scientist, and possessing a Ph.D. degree, appellant was assigned to the position of criteria manager in the Criteria Development Branch of the National Institute of Occupational Safety and Health (NIOSH),[1] where his duties included the performance of certain chemical analyses and the preparation of recommendations for NIOSH safeguards to protect industrial workers exposed to carcinogenic chemicals.

From the outset appellant had difficulty completing his duties to the satisfaction of his superiors. The reasons offered by the parties to explain this problem differ dramatically. Appellant claims that the mal-

feasance of NIOSH management, and of his immediate supervisor in particular, prevented him from conscientiously performing his duties.[2] The Service, on the other hand, proffers a portrait of appellant that generally depicts him as uncooperative, dilatory and professionally ineffective. *See* Appellees' Brief at 2–7.

The confrontation, which had been brewing for some time,[3] finally erupted on June 3, 1974 when appellant filed an informal grievance against his supervisor,[4] apparently in response to the latter's threat to have him fired. A few days thereafter, the supervisor wrote a memorandum "for the record" detailing what he considered to be appellant's very poor job performance and occasionally irascible demeanor. At the direction of NIOSH management, he also submitted a special Commissioned Officers' Efficiency and Progress Report on appellant (Progress Report), which appellant considered "extremely derogatory."[5] Appellant's Brief at 3. Appellant claims that he was never even apprised of the contents of his supervisor's memorandum, *id.,* although the PHS maintains that a copy was sent to him.[6] He apparently did see the contents of the special Progress Report, however.

---

1. The Criteria Development Branch is a unit of NIOSH's Office of Research and Standards Development. NIOSH, itself, is a bureau within the Department of Health, Education and Welfare (HEW).

2. Appellant specifically charges that his supervisor prevented him from obtaining reference material necessary to complete his work relating to a certain chemical, which he claims later to have identified as a carcinogen. Moreover, NIOSH allegedly rejected his finding although it was confirmed by a subsequent independent study. Appellant also charges that his supervisor prevented him from correcting NIOSH's reduction of the recordkeeping period from twenty to five years in a document which required employers to maintain medical records on workers exposed to another chemical. Appellant's Brief at 2.

3. For example, appellant's supervisor had documented his abuses of established leave policies and, as early as December 21, 1973, had reprimanded appellant by memorandum for such abuses. Appellees' Brief at 2; Appellees' App. at 1.

4. At the time appellant filed his grievance, and perhaps even now, the Commissioned Corps personnel system did not provide any formal grievance mechanism for a PHS commissioned officer to complain about a civil-service supervisor. *See* Appellees' App. at 13, 16, 18. For this reason, appellant's grievance document was returned to him as inappropriate. As an alternative, NIOSH management instructed his supervisor to complete a special fitness report on appellant and to discuss its contents with him. *Id.* at 16. See text accompanying notes 5–7, *infra.* This alternative was abandoned, however, after an inquiry by a congressman on appellant's behalf, and NIOSH substituted an informal grievance procedure directed by a special investigator.

5. See note 7, *infra.*

6. There is no indication in the memorandum cited by PHS that a copy was given to appellant. Compare Appellees' Brief at 4 n. 3 with Appellees' App. at 6.

On August 1, 1974, appellee Treusdell, Director of PHS's Commissioned Personnel Operations Division (CPOD), appointed a senior commissioned officer of the Service to investigate appellant's charges and to make written findings and recommendations. Six weeks later, the investigating officer concluded his inquiry and recommended: (1) that all charges be dismissed as unsupported by the facts; (2) that communications between NIOSH supervisors and employees be improved; (3) that the special Progress Report submitted by the supervisor be withdrawn as "totally inappropriate";[7] (4) that appellant be transferred to new duties, if possible; and (5) that appellant should not be prejudiced in any way for having filed the grievance. The investigating officer also concluded that appellant's difficulties within NIOSH did not justify his dismissal at that time. Appellees' App. at 16–19.

The Service claims that appellant, through his counsel, rejected these recommendations. Appellees' Brief at 4. Even the most cursory reading of his counsel's response, however, shows that, although he offered further suggestions, he was generally satisfied with all of them. See Appellees' App. at 12, 20–21. Nevertheless, since NIOSH management could not accommodate appellant's desire to continue his present work in another branch, the grievance was eventually sent up to the Assistant Secretary for Health, who approved the recommendations of the investigator on December 15. Appellant was notified of this final disposition three weeks later. He was provided a copy of the Assistant Secretary's decision and offered, but did not accept, an opportunity to discuss its terms.

During the lengthy processing of his grievance, appellant's relations with his superiors continued to deteriorate. Soon after filing his grievance, appellant began what was to become a lengthy correspondence with various congressmen in which he criticized NIOSH management. Copies of at least some of these letters were returned to the agency for explanation. Then, on November 25, 1974, while final resolution of the grievance was still pending, appellant's supervisor formally requested that appellant's reserve commission be terminated for unsatisfactory performance.[8] One intermediate official concurred, but apparently Treusdell, the personnel director, took no action on it. Appellant was not informed that his supervisor had made this termination request until nearly two months later.

The new year, 1975, was to prove no better, even though NIOSH had arranged for appellant to have a new supervisor. In January, appellant's criticism that NIOSH was needlessly allowing workers to be exposed to cancer risks appeared in a *New York Times* article.[9] In February, appellant became involved in the equal opportunity complaint of a fellow employee and soon thereafter charged NIOSH with taking reprisals against him for that involvement. A second request for involuntary termination of appellant's commission quickly followed, this time from the new supervisor, who submitted new charges and even more extensive supporting documentation of unsatisfactory job performance. Appellant immediately countered by filing misconduct charges against the new supervisor and another NIOSH official, which were ultimately rejected. Appellees' App. at 69–70.

7. The PHS personnel manual apparently only provides for one annual fitness report. *See* Commissioned Corps Personnel Manual, Sub-Chapter CC 23.7, Personnel Instruction 6 § C(3) (Aug. 14, 1969) [hereinafter *Personnel Manual*]; Appellant's App., Doc. A. Thus, the supervisor's submission of an interim report, months before the annual report on appellant was due, was unauthorized by the applicable internal administrative regulations. *See* Appellees' App. at 18–19.

8. The supervisor's request was submitted in accordance with the relevant Personnel Manual provisions. The supervisor justified his request by referring to six separate areas in which he deemed appellant's performance unsatisfactory, a summary of his attempts to counsel appellant and to find him an adequate alternative assignment, a current (November, 1974) Progress Report, and 273 pages of what he considered to be relevant documentation.

9. N.Y. Times, Jan. 27, 1975, § C at 16; Appellees' App. at 28.

### B. *The Involuntary Separation Proceeding*

NIOSH, it appears, soon concluded that it had suffered long enough. In March Treusdell notified appellant that an Involuntary Separation Board (Board) would be convened to consider nine specific charges previously made against him in the termination requests of his two supervisors. Appellant was given copies of these requests and all supporting documentation, notified of the charges against him, and informed of his right to reply in writing. *See id.* at 54–60.

After appellant's request that the Board delay its inquiry until his EEO complaint could be processed [10] was denied, he submitted written responses to the charges and asked that he be accorded certain due process rights.[11] This request was also denied, and appellant and his counsel were not permitted to attend the meetings of the Board. On May 2 appellant was notified by the Director of the Office of Personnel Management that, in accordance with the Board's recommendation, his commission would be terminated on June 6. The letter of notification informed him of his right to appeal [12] but did not state the specific reasons for the termination decision as required by PHS personnel regulations. Appellant did appeal his termination but was informed by the Assistant Secretary for Health [13] that, upon careful review of the

Board's findings and recommendation and appellant's rebuttals to the charges, he considered the Service's action justified and that no further administrative review was available. The Assistant Secretary further stated that appellant's request to personally present his appeal had been denied, because he had not affirmatively stated any reason why he should be continued on active duty.[14]

### C. *District Court Proceedings*

Appellant filed this suit in June, 1975, immediately prior to being informed of the agency's final decision. He asked for declaratory and injunctive relief on the grounds that the administrative procedures followed in terminating his commission violated his due process rights and that the termination itself was in retaliation for his exercise of the constitutional right of free speech. Appellant immediately filed a motion for a temporary restraining order (TRO) to restrain the Service from terminating his commission, which was denied for failure to exhaust administrative remedies since the agency's final decision was still pending. After appellant was notified of the Assistant Secretary's decision and finally given a copy of the Board's specific findings, which should have accompanied the termination notice handed-down more

---

10. Appellant's request for postponement was denied because the Service considered that the termination request, based on substandard performance, was not related to the charges in his EEO complaint. Record Doc. 1, Ex. 6, 8(b). The Deputy Director of Equal Employment Opportunity for HEW had rejected appellant's EEO complaint on the grounds that his employment was not governed by civil-service regulations upon which he had based his charges, but nevertheless remanded his complaint to an EEO official within PHS for appropriate corrective action.

11. According to appellant, he specifically requested to attend the Board's meetings, to be represented there by counsel and to cross-examine witnesses. Appellant's Brief at 5.

12. *See generally Personnel Manual, supra* note 7, at § I(2) (right to review of termination upon request, in writing, with reasons why officer should be continued on active duty).

13. Appellant had appealed to the Surgeon General of the Service, who was the official specified in the personnel regulations. The Assistant Secretary for Health, however, stated that he had been delegated all the functions of the Surgeon General and was therefore the proper reviewing official. See note 39, *infra*.

14. The pertinent portion of the Assistant Secretary's letter reads:

It is apparent from the record that you requested review of the decision to terminate your commission with the advice and assistance of legal counsel. You failed, however, to state any reasons why you should be continued on active duty as required by CCPM Sub-Chapter CC23.7, INSTRUCTION 6, Section I 2. You may not, at a later date, correct that error. For this reason, your request for a personal appearance is denied.
Appellant's App., Doc. C.

than a month before, he renewed his motion for a TRO. He then withdrew it when the Service represented that he would not be terminated until he had an opportunity to contest these specific findings. Appellant subsequently declined the agency's offer to reopen the administrative proceedings, however, apparently because the agency would not allow him to present his case through an attorney to someone other than the Assistant Secretary for Health. *See* Appellees' App. at 71; Appellant's Reply Brief at 4. Appellant's third motion for a TRO was granted, but a week later, after holding a hearing, the district court dismissed his suit for failure to state a claim over which the court had jurisdiction.[15] With appellant's tortuous odyssey within the Service ended for the time being, this appeal ensued.

## II. RESOLUTION OF THE MERITS

### A. *The Motion to Dismiss*

 Appellant preliminarily contends that the district court applied an incorrect standard in granting the Service's motion to dismiss. He argues that his complaint was immune from dismissal because he had alleged facts which, if proven true, would provide a basis for judicial relief,[16] relying chiefly on *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), one of many cases emphasizing the liberal construction to be accorded pleadings under the federal rules.[17] His argument is miscast, however. Although the district court stated that it was dismissing appellant's suit for failure to state a claim over which it had jurisdiction, Appellant's App., Doc. G at 3, its decision should properly be characterized as a summary judgment inasmuch as both parties had presented affidavits and other materials "outside the pleading", these were expressly considered by the court, and it is clear from the memorandum accompanying the court's Order that an intended, albeit unarticulated, ground for dismissal was Rule 12(b)(6), for failure to state a claim upon which relief could be granted. Fed.R.Civ.P. 12(b)(6). *See Richardson v. Rivers,* 118 U.S.App.D.C. 333, 335 F.2d 996, 998 (1964). A motion to dismiss for failure to state a claim upon which relief can be granted is treated as a motion for summary judgment, if "matters outside the pleading are presented to and not excluded by the court . . .."[18] Fed.R.Civ.P. 12(b). Therefore, although the district court's ruling was not perhaps congruent with the most orderly procedure, we will treat it as an award of summary judgment to appellees[19] for which the applicable standard of review is whether there existed any genuine issue of material fact and, if not, whether the appellees were entitled to their judgment as a matter of law. *See id.* 56(c).

---

15. The district court held that appellees had followed their prescribed procedures and that the termination decision was not related to appellant's exercise of his first amendment rights. The court further implied that appellant's contention that the PHS regulations violated his due process rights was without merit. *See id.,* Doc. G.

16. Rule 12(b) of the Federal Rules of Civil Procedure, which states seven separate grounds, substituted the motion to dismiss for the common law's demurrer as the pleading device to challenge the legal sufficiency of facts alleged in a complaint.

17. *See, e. g., Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 334–35, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Constructores Civiles de Centroamerica, S.A. v. Hannah,* 148 U.S.App.D.C. 159, 459 F.2d 1183, 1185 (1972).

18. Indeed the passage in the *Scheuer* opinion quoted by appellant clearly notes the availability of summary judgment under these circumstances:

When a federal court reviews the sufficiency of a complaint, *before the reception of any evidence* either by affidavit or admissions . . ., its task is necessarily a limited one. 416 U.S. at 236, 94 S.Ct. at 1686 (emphasis added). To warrant such treatment, however, all parties must "be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(b).

19. *But cf. Gould, Inc. v. Chafee,* 146 U.S.App. D.C. 206, 450 F.2d 667, 669 (1971) (refusal to treat grant of motion to dismiss as summary judgment because no reasons given and some bases for order "would be at best of doubtful legality").

## B. *The Due Process Claim*

In his due process claim appellant only contests the legal conclusions of the district court, since the material facts related to this issue are not in dispute. The PHS personnel regulations governing reserve commissioned officers provide limited procedural protections. Under these regulations appellant was entitled to notice of any termination proceedings and the specific charges made against him, an opportunity to rebut those charges in writing, consideration of the charges and rebuttals by a Board comprised of three senior PHS officers who had not considered the case previously, notification of the specific grounds for his termination, and review of the decision by an appropriate agency official in light of the Board's report and the officer's written appeal. The question which we must now decide is whether the due process clause of our Constitution's fifth amendment entitles him to any greater procedural protection.[20] We hold that it does not.

■ Just a few years ago the Supreme Court expansively broadened the scope of procedural due process protection[21] in a well-known series of cases.[22] *E. g., Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Board of Regents v.*

*Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Nevertheless, as a threshold requirement the plaintiff in a public employee dismissal case must show that he has either a legitimate entitlement with respect to his job, which would be protected as property under the fifth or fourteenth amendments, or that his dismissal deprives him of a liberty interest protected by those constitutional provisions. *See Board of Regents v. Roth, supra,* 408 U.S. at 569–71, 92 S.Ct. 2701. Only if the court first finds that a "liberty" or "property" interest is affected will it go on to a balancing of interests analysis to determine what level of procedural protection is appropriate. *E. g., Fusari v. Steinberg,* 419 U.S. 379, 389, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975); *Board of Regents v. Roth, supra,* 408 U.S. at 570–71 & n. 8, 92 S.Ct. 2701; *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

■ Appellant's principal due process claim[23] is based on the theory that his

---

**20.** The regulations do not permit, as appellant wishes, a personal appearance by the officer or his counsel before either the Board or the reviewing official, or the presentation and cross-examination of witnesses. The officer may be invited to appear personally, however, if the Board or reviewing official so desires. *Personnel Manual, supra* note 7. Record Doc. 1, Ex. 10, letter of May 1, 1975.

**21.** Formerly, government employment was considered a privilege, not a right, so that a public employee's dismissal was not subject to either substantive or procedural due process protection. *See, e. g., Bailey v. Richardson,* 86 U.S.App.D.C. 248, 182 F.2d 46, 58–59 (1950), *aff'd by an evenly divided court,* 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352 (1951); *McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 220, 29 N.E. 517 (1892) (Holmes, J.: "The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman."). This view, that the dichotomy between "rights" and "privileges" was determinative of which interests were deserving of due process protection and which were not, had already been rejected by the time of the Su-

preme Court's *Goldberg* decision. *See, e. g., Shapiro v. Thompson,* 394 U.S. 618, 627 n. 6, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). *See also Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Cafeteria & Restaurant Workers v. McElroy,* 367 U.S. 886, 894, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).

**22.** Although these five cited cases involved interpretation of the fourteenth amendment's due process clause, the principles addressed therein are fully applicable to the fifth amendment's "liberty or property" language as well. *See Paul v. Davis,* 424 U.S. 693, 702 n. 3, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

**23.** Appellant does not argue, except perhaps obliquely, that he had a "property" interest in his federal employment. Nevertheless, we think that it is worthwhile to elucidate our conclusion that there is no protected property interest involved in this case.

Pursuant to 42 U.S.C. § 209(a)(2) (1970), appellant's reserve commission in the Service

termination by the Service "on the grounds of marginal and substandard performance" was granted for an indefinite period and could be terminated at any time as the President might direct. These presidential commissions are issued by the Secretary of HEW, *id.* § 209(c), who has been delegated the President's authority to terminate the commissions of reserve officers without their consent and to prescribe regulations governing such terminations. Exec. Order No. 11,140, 3 C.F.R. 177 (1964–1965 Comp.), *reprinted in* 42 U.S.C. § 202 app. at 9533 (1970); *see* 42 U.S.C. §§ 209(a)(2), 216(a) (1970). Furthermore, as members of a "uniformed service," *id.* § 201(p), all PHS commissioned officers, whether regular or reserve, are appointed "without regard to the civil-service laws," *id.* § 204, and consequently are specifically exempted from civil-service protection. 5 U.S.C. § 2101(1) (1970).

In light of the foregoing statutory provisions, PHS argues that the status of its reserve commissioned officers is analogous to that of probationary federal civil-service employees and "probationary" reserve commissioned officers in the armed forces, Appellees' Brief at 16, whose procedural rights according to well-settled law may be severely restricted. *See Sampson v. Murray,* 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974); *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Ring v. Schlesinger,* 164 U.S.App.D.C. 19, 502 F.2d 479 (1974); *cf. Cafeteria Workers, supra,* 367 U.S. at 896, 81 S.Ct. 1743. We find this analogy persuasive, at least insofar as the particular statute delimiting the employment relationship in each case specifically negates a reasonable bilateral prospect of continued employment which might otherwise give rise to a legitimate claim of entitlement requiring procedural due process protection. Section 209(a)(2) of title 42, providing that PHS reserve commissions "shall be for an indefinite period and may be terminated at any time, as the President may direct", is clearly analogous to those sections of title 10 which state that reserve commissioned officers in the armed forces with less than three years of service "may be discharged at the pleasure of the President." 10 U.S.C. §§ 1162(a), 1163(a) (1970). In both instances, the legal effect of the statutes is the same; each clearly specifies that an officer within its terms has no vested right, and consequently no entitlement to continued employment. *See Sims v. Fox,* 505 F.2d 857, 861 (5th Cir. 1974), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 678 (1975) ("One who may be discharged 'at the pleasure' of another; i. e., arbitrarily, for no cause whatsoever, simply has no property right to continued employment.").

Although the genesis of a property interest clearly cannot be found in the statute governing appellant's employment, nor we presume in any contract, PHS's personnel regulations, themselves, could create a protected interest if they reflect a *de facto* policy that a reserve officer would only be terminated for "cause". Both *Board of Regents v. Roth, supra,* and *Perry v. Sindermann, supra,* recognize that a property right may arise from informal "understandings" or policies. 408 U.S. at 577–78, 92 S.Ct. 2701; *id.* at 600–02, 92 S.Ct. 2694; *see Thomas v. Ward,* 529 F.2d 916, 919 (4th Cir. 1975). The question thus becomes whether the provisions of PHS's Personnel Manual generally, and section C(2) in particular, could reasonably be viewed as having created a legitimate claim of entitlement to continued employment absent "sufficient cause," when by statute the appointing official, whether the President or his delegatee, could have *terminated an officer's* reserve commission without his consent, and, by implication, without any cause whatsoever. Section C(2) provides:

> While the maintenance of high performance standards is essential, insistence on these standards will be combined with consideration of the officer. Continuing efforts will be made to assign officers where they can best demonstrate their capabilities. *Ineffective performance in one assignment can be, but will not necessarily be, a basis for termination.* An officer who is ineffective in one assignment will, where practicable, be given an opportunity to demonstrate improved performance in another assignment. *Termination will be considered only after the officer fails to respond to positive efforts to provide him with an opportunity to demonstrate his capabilities.*

*Personnel Manual, supra* note 7, at § C(2). A "boot strap" argument which demonstrated that this provision of the PHS regulations impliedly creates a property interest and at the same time challenged the constitutional sufficiency of the procedural protection provided for that interest by the regulations could not be dismissed on its face. *Compare Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (in which a majority of the Court appear to have accepted such an argument) *with id.* at 163, 94 S.Ct. 1633 (where the plurality of three Justices rejected it). *But see Ring v. Schlesinger, supra,* 164 U.S.App.D.C. at 25–27, 502 F.2d at 485–87 (applying the *Arnett* plurality's dictum). We need not determine its effect in this case, however, because we do not find that the PHS personnel regulations gave rise to an implied promise that a reserve commissioned officer would only be terminated for "cause". The first italicized sentence in section C(2), quoted above, sufficiently negates any objective expectancy that arguably might have been created by the second considered alone. Also see *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Sims v. Fox, supra* at 862 (stating that any "regulations" or "contracts" created by the Air Force would be void as in excess of delegated authority).

deprived him of liberty because it "seriously damage[d] his reputation and standing

within the scientific community and [impaired] his ability to obtain appropriate employment elsewhere." Appellant's Brief at 15. The seriousness of this claim cannot be gainsaid. Although the term "liberty" in the Constitution's due process clauses has never been precisely defined, the Supreme Court has repeatedly emphasized[24] that "[i]n a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed."[25] *Board of Regents v. Roth, supra,* 408 U.S. at 572, 92 S.Ct. at 2707. Exactly how broad its meaning should be, however, remains a matter of considerable debate.

Soon after its decision in *Goldberg v. Kelly, supra,* which first triggered an explosion of due process cases in the federal courts, the Supreme Court accorded "liberty" its broadest interpretation when in *Wisconsin v. Constantineau, supra,*[26] it declared that:

> [w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.

400 U.S. at 437, 91 S.Ct. at 510. The corollary of this much-quoted pronouncement—that any governmental attack on one's reputation constitutes a deprivation of liberty sufficient to require procedural due process protection—raised the possibility, quickly seized upon by numerous lower courts,[27] of a wholesale judicialization of government personnel decisions.

The Supreme Court further clarified the relation of reputation to liberty in *Board of Regents v. Roth, supra,* in explaining why a state college's refusal to renew a nontenured teacher's employment contract did not implicate any cognizable interest in liberty:

> The State, in declining to rehire [him], did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so, this would be a different case.
>
> \* \* \* \* \* \*
>
> Similarly, there is no suggestion that the State, in declining to re-employ [him], imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities. The State, for example, did not

---

**24.** *See, e. g., Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Joint Anti-Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 168, 71 S.Ct. 624, 646–647, 95 L.Ed. 817 (1951) ("[T]he right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.") (Frankfurter, J., concurring).

**25.** Determining whether or not the implicated interest properly falls within the contemplation of the fifth amendment's "liberty or property" language is not a facile or reflexive endeavor. Due process protection is limited, but not rigidly or formalistically so. *Board of Regents v. Roth, supra,* 408 U.S. at 572, 92 S.Ct. 2701. The substance of the constitutional language is not immutable.

> "Liberty" and "property" are broad and majestic terms. They are among the "[g]reat [constitutional] concepts . . . purposely left to gather meaning from experience . . [T]hey relate to the whole domain of social and economic fact, and the statesmen who founded this nation knew too well that only a stagnant society remains unchanged."

*Id.* at 571, 92 S.Ct. at 2706, *quoting National Ins. Co. v. Tidewater Co.,* 337 U.S. 582, 646, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949) (Frankfurter, J., dissenting).

**26.** In *Constantineau* the Supreme Court struck down as facially unconstitutional a state statute permitting government officials to post, without notice and a hearing, the names of those who were not to be sold or given any intoxicating liquors. 400 U.S. at 439, 91 S.Ct. 507.

**27.** For example, in *Bottcher v. Florida Dept. of Agriculture & Consumer Services,* 361 F.Supp. 1123, 1129 (N.D.Fla.1973), *aff'd mem.,* 503 F.2d 1401 (5th Cir. 1974), a district court held that a state employee was entitled to the procedural protections of constitutional due process when her supervisors gave her a conditional fitness rating, citing various instances of substandard performance. The court reasoned that such action infringed her protected interests, · because it "foreclosed or diminished her opportunities for occupational advancement . . ."

invoke any regulations to bar [him] from all other public employment in state universities. Had it done so, this, again, would be a different case.

408 U.S. at 573–74, 92 S.Ct. at 2707. Subsequent lower court decisions have interpreted the guidelines articulated in *Roth* to require that an employee claiming an infringement of liberty show that the government's action was likely to either seriously harm his standing in the community or foreclose his future opportunities for reemployment. *See, e. g., Weathers v. West Yuma County School District,* 530 F.2d 1335, 1338–39 (10th Cir. 1976); *Sims v. Fox,* 505 F.2d 857, 863 (5th Cir. 1974) (en banc), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 678 (1975); *Lipp v. Board of Education,* 470 F.2d 802, 805 (7th Cir. 1972).

Our concern in this appeal, however, is necessarily limited to the second of *Roth's* two "tests". In one of its most recent decisions delimiting the scope of the liberty clause of the fourteenth amendment, the Supreme Court has seriously undermined if not altogether obliterated the protection previously accorded one's general reputation in the community irrespective of any related interest in employment. *Paul v. Davis,* 424 U.S. 693, 701, 706, 710–11, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). *Compare id.* at 731–33, 96 S.Ct. 1155 (Brennan, J., dissenting). Even without the constraint imposed by *Paul,* however, it could not seriously be argued that the circumstances of appellant's termination might damage his standing within his community in any sense envisioned by *Roth* and its progeny.[28]

■ Sensing the weakness of his general reputation injury, appellant bases his due process challenge mainly on the probable foreclosure of his reemployment opportunities. He argues that "[a]s long as the charges made against an employee can reach those who are interested in his professional reputation, the employee is entitled to due process protections." Appellant's Reply Brief at 13. If this were an accurate statement of the law, and we do not believe it is, it would nonetheless not apply to appellant unless the reasons for his termination are in fact made public. *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). *Accord Sims v. Fox, supra* at 863; *Shirck v. Thomas,* 486 F.2d 691, 693 (7th Cir. 1973), *vacated and remanded on other grounds,* 408 U.S. 940, 92 S.Ct. 2848, 33 L.Ed.2d 764 (1972). *But cf. Goss v. Lopez,* 419 U.S. 565, 575 & n. 7, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Of course, where the government publicly disseminates information concerning its adverse personnel actions, or where it simply makes certain information available to prospective employers, a court must proceed to determine whether the information disclosed is of such a derogatory nature as to infringe a liberty interest of the employee. *See, e. g., Velger v. Cawley,* 525 F.2d 334 (2d Cir. 1975), *rev'd on other grounds sub nom. Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (personnel files available to public and private employers upon request); *Greenhill v. Bailey,* 519 F.2d 5 (8th Cir. 1975) (information suggesting medical student's unfitness available to all accredited medical schools); *Wellner v. Minnesota State Junior College Board,* 487 F.2d 153 (8th Cir. 1973) (unfavorable information in permanent file to which future employers would likely have access). In this case, however, the parties dispute whether or not the reasons for appellant's termination will remain confidential.

The Service invites our attention to an internal rule of HEW applicable to the record system [29] which covers the files of ad-

---

**28.** The charges against appellant, alleging substandard performance and insubordination, do not amount to accusations of dishonesty or immorality or anything remotely approaching the nature of these "degrading" and "unsavory" stigmas which would "expose him to public embarrassment and ridicule . . . ." *Wisconsin v. Constantineau, supra,* 400 U.S. at 436–37, 91 S.Ct. at 509.

**29.** On August 27, 1975, HEW published notice of record systems it maintained and proposed routine uses thereof pursuant to the Privacy Act of 1974, 5 U.S.C. § 552a (Supp. V 1975). 40 Fed.Reg. 38,391 (1975). The various sys-

verse actions or involuntary terminations with respect to PHS commissioned officers, and any related correspondence. That rule specifically provides that this information shall be kept in a locked metal cabinet and not made public.[30] Appellees' App. at 79. This might end the matter, if it were not for the fact that appellant refers us to a rule applicable to another system which permits "limited information [to be] provided prospective employers upon inquiry" contained in "Official Personnel Folders" and "Service Record Cards (summarizing personnel actions)."[31] *Id.* In view of this apparent inconsistency and the lack of any further explanation by the parties, we cannot now conclude that the reasons for appellant's termination will remain confidential. Assuming for the sake of argument that they will not, we turn to the question of whether they were of such a nature as to infringe his liberty.

▇ Appellant's termination does not disqualify him from engaging "in any of the common occupations of life . . .," *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), nor does it effectively deprive him of a future possibility to pursue his chosen profession as a

scientist, *see, e. g., In re Ruffalo,* 390 U.S. 544, 550, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968) (disbarment), whether in government, *see Board of Regents v. Roth, supra,* 408 U.S. at 573–74, 92 S.Ct. 2701, or even in his chosen geographical area, *see Christhilf v. Annapolis Emergency Hospital Assn.,* 496 F.2d 174, 178 (4th Cir. 1974). If it did, we might readily conclude that the action deprived him of liberty. The barrier of which appellant complains is a practical not legal one, however. He argues rather that he has been deprived of liberty since disclosure of the reasons for his termination to prospective employers would "*impair* his ability to find other employment in his chosen field." Appellant's Reply Brief at 10 (emphasis added). To infringe one's liberty, the effect of government action on future employment must extend beyond a disadvantage or impediment; it must "foreclos[e] his freedom to take advantage of other employment opportunities." *Board of Regents v. Roth, supra,* 408 U.S. at 573, 92 S.Ct. at 2707. In *Roth,* the Supreme Court cautioned that

[m]ere proof, for example, that his record of nonretention in one job, taken alone, might make him somewhat less attractive

---

tems of records apparently were already maintained as of Aug. 27, 1975, the date on which notice was published. Final adoption of the proposed uses was postponed pending consideration of public comments. *Id.*

**30.** This particular provision, OASH OAM 0006.00, permits access only to "HEW employees who decide or process grievances, [EEO] complaints or disciplinary actions or who assist those who do so." 40 Fed.Reg. 38,391, 38,669 (1975). This exception is clearly inapplicable to appellant's case.

**31.** This particular record system is identified as OASH OAM 0007.00. It is not clear exactly what information would be available to prospective employers under the proposed routine use of this particular system. The Privacy Act, however, specifies certain conditions of disclosure of an agency's "records", defined as any item or grouping of information including, but not limited to, an individual's employment history. 5 U.S.C. § 552a(a)(4) (Supp. V 1975). Section 552a(b)(3) provides:

No agency shall disclose any record which is contained in a system of records by any means of communication to any person . .

except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be—

\* \* \* \* \* \*

(3) for a routine use as defined in subsection (a)(7) of this section . . . .

*Id.* § 552a(b)(3). Subsection (a)(7) defines "routine use" to mean "with respect to the disclosure of a record, the use of such record for a purpose *which is compatible with the purpose for which it was collected." Id.* § 552a(a)(7). Whether or not dissemination of limited information regarding a federal employee's dismissal is compatible with the purpose for which the information was collected by the agency, is a question which cannot be appropriately resolved on this appeal. We note, however, that these provisions of the Privacy Act do appear to limit the range of information which might be obtained by a prospective employer under the record system to which appellant refers us. We presume, too, that the communication of derogatory information about an employee would not be "compatible with the purpose for which it [was] collected."

to some other employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of "liberty".

*Id.* at 574 n. 13, 92 S.Ct. at 2708. The personnel action in *Roth*, of course, had not been accompanied by any reasons whatsoever, whereas in the instant case the adverse action was taken expressly for reasons of unsatisfactory job performance and insubordination. The disclosure of these reasons might well interfere with his opportunities for subsequent employment. We do not believe, however, that they are of such a serious and derogatory nature as to require procedural due process protection.

■ Appellant was not terminated for dishonesty,[32] for having committed a serious felony,[33] for manifest racism,[34] for serious mental illness,[35] or for lack of "intellectual ability, as distinguished from his performance . . . ."[36] Whereas dismissals for these reasons have been held to affect liberty, dismissals for reasons similar to those given in appellant's case have generally been deemed not to touch a liberty interest. *See, e. g., Lake Michigan College Federation of Teachers v. Lake Michigan Community College*, 518 F.2d 1091, 1097 (6th Cir. 1975), *cert. denied*, 427 U.S. 904, 96 S.Ct. 3189, 49 L.Ed.2d 1197 (1976) (disruptive con-

duct); *Abeyta v. Taos*, 499 F.2d 323, 327 (10th Cir. 1974) (charges of improper and substandard job performance); *Blair v. Board of Regents*, 496 F.2d 322, 324 (6th Cir. 1974) (nonrenewal based on ground that teacher's professional relationships with students failed to meet minimum standards); *Adams v. Walker*, 492 F.2d 1003, 1008–09 (7th Cir. 1974) (unelaborated charge of "incompetence, neglect of duty and malfeasance in office" to satisfy state constitutional provision); *Jeffries v. Turkey Run Consolidated School District*, 492 F.2d 1, 2 n. 1 (7th Cir. 1974) (teacher "exhibited highly unethical conduct" in openly contradicting a fellow teacher's directives to her students); *Shirck v. Thomas, supra* at 692 (unsatisfactory performance); *Clark v. Holmes*, 474 F.2d 928 (7th Cir. 1972), *cert. denied*, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973) (allegations of certain deficiencies in a teacher's professional conduct); *Russell v. Hodges*, 470 F.2d 212, 217 (2d Cir. 1972) (charges included sleeping on duty, absence from duty without authorization, and wearing improper attire).

Thus, although appellant's case presents a close question, we hold that, on the basis of these particular facts, he has not shown an infringement of liberty.[37] As Judge Friendly has cautioned:

---

**32.** *See Rolles v. Civil Service Commission*, 168 U.S.App.D.C. 79, 512 F.2d 1319 (1975); *McNeill v. Butz*, 480 F.2d 314, 319–20 (4th Cir. 1973).

**33.** *See United States v. Briggs*, 514 F.2d 794, 798 (5th Cir. 1975).

**34.** *See Wellner v. Minnesota State Junior College Board, supra* at 156.

**35.** *See Velger v. Cawley, supra* at 336; *Lombard v. Board of Education*, 502 F.2d 631, 637 (2d Cir. 1974), *cert. denied*, 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975).

**36.** *Greenhill v. Bailey, supra* at 8.

**37.** Neither party refers to *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), in which a sharply-divided Supreme Court held that high school students had property and liberty interests in their public education and that, accordingly, they could not be routinely suspended without minimal due process protections including a hearing. In *Goss* the

school authorities had suspended the students for ten days on grounds of misconduct. These misconduct charges, according to the Court, "if sustained and recorded . . . could seriously damage the student's standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." *Id.* at 574–75, 95 S.Ct. at 736. Appellant might well have argued that his termination for the reasons asserted would have as adverse an impact on his later professional opportunities as would the student's suspension for misconduct on their futures. Nevertheless, we believe that the holding in *Goss* is a limited one, circumscribed by the peculiar interests of high school students in the educational process, and should not be further extended to the public employment area generally. This restricted reading of *Goss* is, we believe, consistent with subsequent decisions in the Supreme Court and the courts of appeals. *See Paul v. Davis, supra*, 424 U.S. at 710, 96 S.Ct. 1155; *Sims v. Waln*, 536 F.2d 686, 690 n. 4 (6th Cir. 1976); *Barrett v. Smith*, 530 F.2d 829, 834–35 n. 6 (9th Cir. 1975), *cert.*

[W]e believe the Court was thinking of something considerably graver than a charge of failure to perform a particular job, lying within the employee's power to correct; the cases cited as illustrations involved charges of chronic alcoholism or association with subversive organizations. Indeed, a general rule that informing an employee of job-related reasons for termination created a right to a hearing, in circumstances where there was no constitutional requirement for the state to do anything, would be self-defeating; the state would merely opt to give no reasons and the employee would lose the benefit of knowing what might profit him in the future.

*Russell v. Hodges, supra* at 217. *See also McNeill v. Butz*, 480 F.2d 314, 319 n. 1 (4th Cir. 1973).

### C. *First Amendment Claim*

Appellant's inability to establish a property interest in his government employment or an infringement of liberty does not affect his argument that it was improper to dismiss his claim that his termination was based on constitutionally protected criticisms of NIOSH policy and personnel. *See* Appellant's Brief at 22. In *Perry v. Sindermann, supra*, the Supreme Court emphasized that:

[f]or at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This

denied, 425 U.S. 977, 96 S.Ct. 2179, 48 L.Ed.2d 801 (1976); *Burnley v. Thompson*, 524 F.2d 1233, 1240 (5th Cir. 1975). *See also Bishop v. Wood, supra*, 426 U.S. at 348, 96 S.Ct. 2074;

would allow the government to "produce a result which [it] could not command directly." *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460. Such interference with constitutional rights is impermissible.

408 U.S. at 597, 92 S.Ct. at 2697.

■ This principle has often proved more difficult to apply than to justify, however, because the actual grounds for the dismissal of a government employee may not be readily ascertainable, and almost always are vigorously contested by the litigants. Some test is necessary, then, to diagnose the essential causative factor underlying what is frequently a complex decision, cloaked in subjectivity, for the fact that the government may have considered an employee's protected speech or conduct in reaching an adverse personnel decision does not necessarily render that decision constitutionally infirm. *Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). According to *Doyle* the test should be one which "protects against the invasion of constitutional rights without commanding undesirable consequences not necessary to the assurance of those rights." *Id.* at 576. The test developed by the Supreme Court in that case to meet this criterion requires not only that a plaintiff assume the initial burden of showing that his conduct was constitutionally protected and that it was a "substantial" or "motivating" factor in the government's adverse action, but also that, if plaintiff has carried his burden, the government may show by a preponderance of the evidence that it would have reached the same decision had the protected conduct never occurred. *Id.* The touchstone for decision, therefore, is the employee's job performance considered in its entirety.

Unlike *Doyle*, however, the first amendment claim in the case *sub judice* was disposed of by summary judgment. The district court held that appellant's claim was

*Powers v. School District*, 539 F.2d 38, 42 (10th Cir. 1976); *Albach v. Olde*, 531 F.2d 983, 985 (10th Cir. 1976).

"without merit since there is no indication whatsoever in the record . . . that plaintiff's statements in this regard were even considered by the defendants at the various stages of review in the process of termination." Appellant's App., Doc. G at 3. We think it clear that the court's disposition, in substance, amounted to an anticipatory consideration of the merits of appellant's proof that his protected activities were a "motivating" factor in the Service's decision to terminate his commission, or, even, of the Service's proof that it would have reached the same result in the absence of appellant's criticisms.

■ The principles governing the award of summary judgment are well-established. The proper judicial role "is limited to ascertaining whether any factual issue pertinent to the controversy exists; *it does not extend to resolution of any such issue.*" *Nyhus v. Travel Management Corp.,* 151 U.S.App.D.C. 269, 466 F.2d 440, 442 (1972) (emphasis added). *See Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944). An award of summary judgment is authorized only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Of course appellant's assertion that the Service's decision may have been based on his constitutionally protected activities cannot by itself immunize his action from the adverse award of summary judgment. The failure of an opposing party to "set forth specific facts showing that there is a genuine issue for trial" justifies an otherwise appropriate summary judgment, *id.* 56(e), unless he shows that at present he cannot "present by affidavit facts essential to justify his opposition . . . ." *Id.* 56(f). After appellee Treusdell had filed his affidavit categorically denying that the Service's action had been in retaliation for appellant's criticisms and specifically documenting the Service's bona fide performance-related grounds for his termination, Record Doc. 9, appellant filed his own affidavit that offered nothing in rebuttal

which, if proven true, could possibly constitute a first amendment violation. Indeed all he alleged in his affidavit was that he had written several letters to congressmen concerning what he considered to be problems at NIOSH. Record Doc. 10. Without more than the *post hoc ergo propter hoc* allegations of his complaint and affidavit, we might well conclude that the denial of appellant's first amendment claim by summary judgment was appropriate. However, appellant also filed the affidavit of a PHS Supervisory Public Health Advisor who was then serving as the Chief of Program Policy for the National Health Service Corps. Record Doc. 12. This experienced official, himself a member of the Service, offered the following averment in his detailed affidavit:

[I]n retrospect, it is difficult to determine just how the situation between [appellant] and NIOSH had deteriorated to the relationship I encountered in June of 1974. It is even more difficult to discern the reasons why both CPOD and NIOSH management resisted and avoided my attempts at informal resolution, while at the same time professing informality to be the desired style. It was almost as though they wished to establish a lengthy file and encourage [appellant's] frustration with subsequent predictable results.

\* \* \* \* \* \*

In the past year, [appellant's] situation has been an almost classic example of management's reaction to an internal critic . . . ..

\* \* \* \* \* \*

What happens to [appellant] will not go unnoticed by other scientists in NIOSH and the Public Health Service. If his proposed involuntary separation under these circumstances is allowed to stand, then this intimidation will have a chilling effect on others who take their Oath of Office and the "Code of Ethics for Government Service" seriously.

Record Doc. 12, Lauderbaugh Aff. at 5–6. This was sufficient to crystallize a genuine issue of material fact for which a trial is necessary. *See Ring v. Schlesinger, supra,*

164 U.S.App.D.C. at 29–30, 502 F.2d at 489–90; *Hess v. Schlesinger*, 159 U.S.App.D.C. 51, 486 F.2d 1311, 1313 (1973); *Bloomgarden v. Coyer*, 156 U.S.App.D.C. 109, 479 F.2d 201, 206–7 (1973).

■ Appellant here necessarily labored under difficult circumstances in opposing the Service's motion. His termination was not an *overt* retaliation for engaging in protected activities, if it was a retaliation at all. Compare *Perry v. Sindermann, supra,* 408 U.S. at 595 & n. 1, 92 S.Ct. 2694; *Ring v. Schlesinger, supra,* 164 U.S.App.D.C. at 22, 502 F.2d at 482. His only likely avenue of success lay in making credibility an issue, for resolution of the first amendment issue essentially required a determination of state of mind. When motivation is involved and credibility becomes of critical importance, or when essential facts are solely within the control of the moving party, summary judgment generally is inappropriate.

> We believe that summary procedures should be used sparingly . . . where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot.

*Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). *See, e. g., Croley v. Matson Navigation Co.,* 434 F.2d 73, 77 (5th Cir. 1970); *Cellini v. Moss,* 232 F.2d 371, 373, 98 U.S.App.D.C. 114 (1956); 10 C. Wright & A. Miller, Federal Practice and Procedure § 2730, at 583–84 (1973). Were it otherwise, an employing agency would have an even greater incentive to cloak its personnel decisions with a shroud of silence, in some cases perhaps artfully disguising the impermissible basis for its action by assiduously refraining from any reference to, much less criticism of, its employee's constitutionally protected activities.

■ Viewing the record in this case, as we must, in the light most favorable to appellant, the party against whom summary judgment was awarded, *see Poller v. Columbia Broadcasting System, supra,* 368 U.S. at 473, 82 S.Ct. 486; *Weiss v. Kay Jewelry Stores, Inc.,* 152 U.S.App.D.C. 350, 470 F.2d 1259, 1262 (1972), we are constrained to conclude that there is indeed a genuine factual dispute as to whether or not appellant's termination was motivated by impermissible considerations and that, accordingly, the district court's denial of the first amendment claim by summary judgment was error. Passing only on the procedure used here and not on the merits of appellant's claim, we vacate the summary judgment with respect to that claim and remand for trial, once appellant has again exhausted his administrative remedy to which we subsequently conclude he is entitled, where the issue must be resolved in accordance with the test specified by the Supreme Court in *Doyle, supra.*

### D. The Procedural Noncompliance Claim

■ In his final assertion of error, appellant argues that evidence in the record indicating two distinct failures by the Service to comply with its own regulations belies the district court's holding that the agency had followed its prescribed procedures. The issue here is essentially legal, since procedural irregularities are indeed clearly established by the record as appellant maintains.[38]

---

38. Administrative actions are presumed to be valid. The burden is on the party challenging them to overcome that presumption. *Maryland-National Capital Park & Planning Comm'n v. Lynn,* 168 U.S.App.D.C. 407, 514 F.2d 829, 834 (1975); *Udall v. Wash., Va., & Md. Coach Co.,* 130 U.S.App.D.C. 171, 398 F.2d 765, 769 (1968), *cert. denied,* 393 U.S. 1017, 89 S.Ct. 620, 622, 21 L.Ed.2d 561 (1969). We conclude that appellant has met his burden by referring to documents in the record on appeal that indisputably establish that the agency did violate its own regulations in at least one material respect.

Furthermore, PHS does not dispute that the regulations governing involuntary terminations of reserve commissions are set forth in Sub-Chapter CC 23.7 of its Personnel Manual, nor does it attempt to avoid well-established precedent by attempting to argue that its actions with respect to appellant were not required to conform to those regulations simply because it had been delegated the statutory authority to terminate his commission at any time without

The essence of appellant's first argument is that the regulations entitled him to review of the Service's termination decision by the Surgeon General rather than by the Assistant Secretary for Health. We sympathize with appellant's confusion. Section I of Sub-Chapter CC 23.7 provides specifically for review by the Surgeon General. See Appellant's App., Doc. A at 4. On August 6, 1974, however, the Surgeon General's authority to terminate reserve commissions was transferred to the Assistant Secretary for Health.[39] The Service's failure to revise expeditiously its personnel regulations to reflect this redelegation, and its failure to otherwise inform appellant of the proper reviewing official, while perhaps regrettable, are not in and of themselves evidence of arbitrary departure from established administrative practices. Appellant did obtain timely review of the termination decision by the authorized official; he has not alleged that this official lacked impartiality, at least at this stage of the proceedings; and he has not otherwise shown that he was prejudiced in any real sense by the Service's failure to inform him of its administrative reorganization.

Appellant's second claim of material noncompliance with PHS regulations attacks the substance rather than the form of review. He alleges that the meaningful review to which he was entitled under the regulations was vitiated by the Service's failure to notify him, as required, of the specific grounds for his termination. Subsection H(2) of Sub-Chapter CC 23.7 clearly provides that, when the Director, CPOD, has decided to terminate an officer's reserve commission after considering the Board's report and recommendation, the officer must be notified of the "specific basis for the action." *Id.* Appellant received his termination notice by letter dated May 2, 1975, however it failed to give any indication whatsoever of the *specific basis* for his termination. Appellant was informed only that he had the right to an administrative appeal and that the Director, Office of Personnel Management,[40] had reviewed the Board's findings and recommendation fully and had directed that appellant's commission be terminated effective June 6, 1975. *Id.* Doc. B. Only on June 6, after he had filed suit in the district court and sought a TRO, was he finally provided any specification of the actual grounds for the Service's action in the form of the Board's memorandum report to the Director, CPOD. The Service argues that its "inadvertent" failure to provide appellant with the requisite notice was fully rectified by this corrective action and its concurrent proposal, which appellant declined, to reopen the administrative proceedings and to retain appellant at PHS in leave-with-pay status until he had had an opportunity to contest the specific grounds for his termination. Appellees' Brief at 12. While we do not find that appellant's refusal to accept this offer waived his right to contest his dismissal, we do find this offer most significant to our determination of the appropriate remedy to which he is entitled.

his consent. Procedural rules, such as those promulgated by PHS to govern its personnel actions, are binding upon the agency issuing them. *Service v. Dulles,* 354 U.S. 363, 388, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Accardi v. Shaughnessy,* 347 U.S. 260, 266–67, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *Bullock v. Mumford,* 166 U.S.App.D.C. 51, 509 F.2d 384, 387 (1974). This obligation to comply with established procedural standards applies even where the employee, in the absence of such standards, could have been summarily discharged at anytime without procedural safeguards. *Vitarelli v. Seaton, supra,* 359 U.S. at 539, 79 S.Ct. 968.

39. On Jan. 30, 1964, the President delegated to the Secretary, HEW, authority under 42 U.S.C. § 209(a)(2) to terminate the commissions of PHS reserve officers without their consent. Exec. Order No. 11,140, 3 C.F.R. 177 (1964–1965 Comp.), *reprinted in* 42 U.S.C. § 202 app. at 9533 (1970). The redelegation of this authority to the Surgeon General, PHS, on Sept. 28, 1968, was superceded by the Secretary's redelegation of it to the Assistant Secretary for Health, HEW, on Aug. 6, 1974. See Appellees' App. at 75–76.

40. The government has offered no explanation why this termination letter was issued by the Director, Office of Personnel Management, when sub-section H(2) of the regulations would appear to require that it be issued by the Director, CPOD. See *Personnel Manual, supra* note 7, at § H(2).

■ Appellant did receive timely notice of the nine specific charges against him and copies of the supporting documentation submitted to the Board. He was able to rebut the specifics of those charges in writing and to appeal the Director's final determination. Even so, the Service's failure to inform him of the specific grounds of the termination decision, though merely an oversight, cannot be excused as a de minimis or harmless violation of its own regulations.[41]

Appellant could not be expected to prosecute his appeal effectively without knowledge of the precise grounds specified by the Service. Of course, he could have recapitulated his previous rebuttals to each of the nine charges considered by the Board, but since not every charge was actually considered by the Board some of his effort would have been misdirected. More significantly, the final determination within the Service is to be made by the Director, CPOD, not by the Board, and we find nothing in the regulations which makes the Board's findings binding on the Director. As we read these regulations, the notice due a reserve officer facing termination should specify the grounds upon which the Director based his decision and not simply the findings upon which the Board based its recommendation. The Director may be able to satisfy this requirement by expressly adopting the Board's findings, but in this case he only stated that he had fully reviewed them.

■ Appellant may have been prejudiced in yet another way. A request for review of a termination decision must, under section I of the regulations, be made in writing and give reasons why the officer should be continued on active duty. Appellant failed to give any such reasons in his appeal request, and the Assistant Secretary for Health notified him on June 4, 1975, that he could "not, at a later date, correct that error" and that his request for a personal appearance had been denied "for this reason". Appellant's App., Doc. C. This preemptory denial of appellant's fervid and oft-repeated request to state his case in person cannot be reconciled with the fact that the Service's nonfeasance was at least partially responsible for appellant's omission.[42] The clear implication of the Assistant Secretary's statement is that appellant would have been permitted to appear personally had he stated reasons. Whether or not such an appearance would have proved beneficial to appellant, it should not have been denied to him because the Service had failed to provide him the notice required by its own regulations.

■ Where, as here, a government employee has no procedural due process rights apart from those which the agency has chosen to create by its own regulations, scrupulous compliance with those regulations is required to avoid any injustice. See *Vitarelli v. Seaton*, 359 U.S. 535, 539–40, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). See also *Morton v. Ruiz*, 415 U.S. 199, 235, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974).

■ Having decided that appellant was wronged, we must now settle upon a suitable remedy. We note that on the effective date of his termination appellant was offered but declined the opportunity to remain in the Service until he had been able to contest the specific basis for his termination. In *Gratehouse v. United States*, 512 F.2d 1104, 206 Ct.Cl. 288 (1975), the one case we have found directly addressing the legal consequences of such a refusal in roughly

**41.** Where the violation of a procedural regulation is deemed harmless, the personnel action will not be adjudged void. However, a procedural error is not made harmless simply because the government employee appears to have had little chance of success on the merits anyway. See *Bell v. United States*, 366 U.S. 393, 413–14, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1961); *Gratehouse v. United States*, 512 F.2d 1104, 1108 & n. 3, 206 Ct.Cl. 288 (1975).

**42.** Appellant's oversight must also be considered in the context of what had become a perceptibly poisoned relationship between him and his employing agency, for which the latter, again, was not altogether free of responsibility. See text at notes 7, 12, *supra*.

similar circumstances,[43] the Court of Claims applied a test which we consider applicable to this case as well.[44]

The consequences of a refusal to accept an agency's offer to remedy a possible, though disputed, procedural error will depend on the timing and nature of the offer. We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time. Recently, in fact, we applied this rule specifically to the [Civil Service Commission]. *Bookman v. United States*, 453 F.2d 1263, 197 Ct.Cl. 108 (1972). In *Bookman* we noted . . . that "reconsideration is often the sole means of correcting errors of procedure or substance." We stated further:

> * * * this court will sustain the reconsidered decision of an agency, as long as the administrative action is conducted within a short and reasonable period. [citation omitted]

What is a short and reasonable time period will vary with each case, but absent unusual circumstances, the time period would be measured in weeks, not years. A correction of an error within a reasonable time period will have retroactive effect, or, in other words, will preclude any cause of action based on the original error.

Where reasonable time for reconsideration has expired, there is no longer an opportunity to correct the procedural error retroactively.

*Id.* at 1109. *See American Trucking Assns. v. Frisco Transp. Co.*, 358 U.S. 133, 144–45, 79 S.Ct. 170, 177, 3 L.Ed.2d 172 (1958) ("[T]he presence of authority in administrative officers and tribunals to correct such errors [due to inadvertence or mistake] has long been recognized—probably so well recognized that little discussion has ensued in the reported cases.") *See generally* 2 K. Davis, Administrative Law Treatise § 18.09, at 606 (1958).

██ We cannot say that the Service's offer to appellant came so late as to justify his refusal. In fact, the offer to reopen the administrative proceedings came rather early: on the effective date of appellant's termination,[45] when it appears the Service

---

**43.** In *Gratehouse* a career government employee of the Department of HUD sought reinstatement and back pay because of an alleged procedural error by the Civil Service Commission's Board of Appeals and Review (BAR). The employee had unsuccessfully sought to withdraw his resignation immediately prior to its effective date. When unsuccessful he appealed to the CSC alleging for the first time that his resignation was involuntary. The CSC Appeals Examining Office (AEO) recommended that he be reinstated, but only on the ground that there had been a procedural deficiency in the agency's denial of the withdrawal. HUD appealed that decision to the BAR which reversed the AEO but apparently without realizing that the employee had made a claim of involuntariness. Approximately two years later, after commencement of proceedings before the district court, the CSC finally offered plaintiff a hearing on his duress claim. However, the CSC insisted that the hearing have retroactive effect and preclude the recovery of any back pay in the event BAR ultimately decided against the plaintiff. Plaintiff refused the CSC's offer. *Gratehouse v. United States, supra* at 1107–09.

**44.** As in *Gratehouse*, we are not confronted with the question of whether res judicata effect should be accorded an agency's challenged decision with its concomitant considerations of the desirability of finality. *See, e. g., CAB v. Delta Air Lines, Inc.*, 367 U.S. 316, 321, 81 S.Ct. 1611, 6 L.Ed.2d 869 (1961). All we face is the inadvertent omission by an agency to communicate all the notice that was due its employee under prescribed regulations. Thus, properly we believe, the consequences of appellant's refusal must depend here, as in *Gratehouse*, simply on the timing and nature of the Service's offer.

**45.** Compare *Gratehouse v. United States, supra* at 1110, where the court stated:

> In the instant case, defendant's offer of a CSC hearing 2 years after a hearing could have been held was far too late to qualify as reconsideration. Thus, plaintiff was entirely justified in refusing the offer, once it was ascertained that any decision arising out of that hearing was to have retroactive effect. Had he accepted such an offer, plaintiff would have waived any right he might have had under different circumstances to recover back pay as a result of the alleged faulty procedure.

was first informed of its error.[46] Furthermore, it provided for the retention of appellant in pay-with-leave status during the time necessary to contest the specific grounds; his acceptance would not have forced him into the dilemma of risking success upon reconsideration by the agency at the cost of waiving any right to recover back pay.[47] We also cannot fault the substance of the Service's offer. It was not mere "confetti throwing" by the government, *see Vitarelli v. Seaton, supra,* 359 U.S. at 549, 79 S.Ct. 968 (Frankfurter, J., concurring and dissenting), or an unavailing post hoc rationalization, *see Van Bourg v. Nitze,* 128 U.S.App.D.C. 301, 388 F.2d 557, 565 (1976). If appellant had accepted the offer, he would have received the one procedural safeguard to which he was still entitled and would have been given as good an opportunity to make his appeal as he would have had had the error never occurred.[48]

In view of the confusion which inevitably resulted from the Service's generally poor handling of this termination proceeding, we believe that the only appropriate remedy for this particular breach is to order the administrative proceedings reopened for a reasonable period, as the Service first offered, to allow appellant to contest the specific grounds for his termination before the Assistant Secretary for Health,[49] in accordance with the procedures established in Sub-Chapter CC 23.7 and existing at the time of appellant's termination. We are constrained to make one addition, however. Since the clear implication by negative inference of the Assistant Secretary's letter of June 4, 1975, was that appellant would have been allowed to appear personally to state his case on appeal had he offered any

---

**46.** Upon receiving the termination letter of May 2, 1975, appellant must have realized that it failed to state the specific basis for the action as required. Appellant had been given a copy of the applicable procedures, yet he made no attempt to inform the Service of its oversight. Under other circumstances we might consider that the Assistant Secretary's letter, stating that appellant could not correct his own error in not stating reasons, led him to conclude that correction and reconsideration were unavailable, but here appellant received the Assistant Secretary's decision more than a month after the Service's termination notice and after he had already come into court. Compare *id.*

**47.** Appellant only seeks the equitable remedy of reinstatement. He does not now seek back pay, although an award of the reinstatement remedy generally will include the recovery of any pay of which a plaintiff has been improperly deprived by virtue of a procedurally-defective termination proceeding. *See Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Thomas v. Ward, supra* at 920; *Skehan v. Board of Trustees,* 501 F.2d 31, 40 (3d Cir. 1974); *cf.* Back Pay Act of 1966, 5 U.S.C. § 5596 (Supp. V 1975).

**48.** Appellant refused the offer to reopen the review proceedings ostensibly on the ground that the Assistant Secretary could not properly rehear the appeal since he would be biased by his previous affirmance of the termination decision. Appellant further insisted that he be allowed to present his case through counsel, and that he be given at least sixty days notice if terminated. Appellant's Reply Brief at 4; Appellees' App. at 71.

That the Assistant Secretary had previously reviewed appellant's case and had affirmed the Service's decision does not *ipso facto* disqualify him from reconsidering the same appeal upon a reopening of the administrative proceedings. *See Joint School District v. Hortonville Ed. Assn.,* 426 U.S. 482, 493, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976); *Withrow v. Larkin,* 421 U.S. 35, 46–49, 95 S.Ct. 1456, 45 L.Ed.2d 712 (1975); *NLRB v. Donnelly Garment Co.,* 330 U.S. 219, 236–37, 67 S.Ct. 756, 91 L.Ed. 854 (1947). Appellant does not otherwise claim that this particular official had a disqualifying pecuniary interest in the outcome of the appeal, *see Gibson v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973), or had exhibited substantial personal prejudice toward him, *see Taylor v. Hayes,* 418 U.S. 488, 502–03, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974). We also find nothing in the record that would indicate that "marked personal feelings were present on both sides" or that "the marks of . . . unseemly conduct [had] left personal stings". *Mayberry v. Penn.,* 400 U.S. 455, 464, 91 S.Ct. 499, 504, 27 L.Ed.2d 532 (1971), *quoted in Taylor v. Hayes, supra,* 418 U.S. at 503, 94 S.Ct. 2697 (both cases dealing with disqualification of judges in contempt proceedings).

As to appellant's other requests, he simply had no right to either under the applicable personnel regulations.

**49.** Of course, such review would be to any other agency official to whom the relevant authority may have been redelegated subsequent to August 6, 1974, when it was transferred to the Assistant Secretary.

reasons justifying his retention,[50] we consider that fairness requires that appellant be accorded this opportunity in the likely event he now does assert such reasons.[51] Finally, we conclude that reinstatement before a decision on the merits of appellant's appeal is not justified by the circumstances, and we do not require that the Service reinstate appellant in pay-with-leave status during the pendency of the reopened proceedings as it initially offered. The decision of the district court is therefore reversed and the case remanded for entry of partial summary judgment on appellant's procedural noncompliance claim consistent with the views set forth above.

### III. CONCLUSION

Our legitimate role in a case such as this is necessarily a limited one. We must apply the Constitution, while carefully avoiding the temptation to act as ombudsmen for public employer-employee relations. "The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies." *Bishop v. Wood, supra,* 426 U.S. at 349, 96 S.Ct. at 2080. Nevertheless, those decisions must be reached consistent with any procedural safeguards created by the employer and the salutary proscriptions of our Constitution. To assure that the personnel decision in the instant case was so reached, we must reverse the district court's award of summary judgment to the government on appellant's procedural noncompliance claim and afford him the opportunity of prosecuting his administrative appeal once again. In the event that this appeal ultimately proves unsuccessful, appellant must be permitted his day in court to litigate his first amendment claim on the merits.

*Judgment accordingly.*

ROBB, Circuit Judge, concurring:

Although I concur in the remand of this case to the Agency, for compliance with procedural requirements, I do not agree that the record discloses any issue of material fact with respect to a violation of the appellant's First Amendment rights. In my view the statements of Mr. Lauderbaugh, in which he expresses certain conclusions and opinions about the matter, do not raise the essential issue.

BAZELON, Chief Judge, concurring in part and dissenting in part:

I agree with the majority that the Public Health Service (PHS) failed to abide by its own regulations in dismissing appellant and that this failure requires reversal; I also agree with Judge Tamm that the grant of summary judgment with respect to appellant's first amendment claim was improper. However, because I conclude that appellant *did* have a protected "property interest" in his continued employment with PHS, I must respectfully dissent from that portion of the majority opinion which holds that appellant was not entitled to the protections of due process when his employment was terminated.

#### I.

In order to have a "property interest" in employment, an individual must have "more than a unilateral expectation" that his employment will continue. "He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Where an individual's job is "terminable at the will" of his employer, "irrespective of the quality of [the employee's] performance", no such entitlement exists. *Bishop v. Wood,* 426 U.S. 341, 345 n. 9, 96 S.Ct. 2074, 2078, 48 L.Ed.2d 684 (1976). Where, however, an employee may be discharged only for "cause," that employee's expectation of continued employment does constitute a "property interest" and is entitled to the protections of the Fifth Amendment. *Arnett v. Kennedy,* 416 U.S. 134, 166, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974)

---

**50.** See text at note 42, *supra.*

**51.** This does not afford appellant, however, any additional right not otherwise specifically created by the personnel regulations.

(opinion of Powell, J.); *Bishop v. Wood, supra*; *Codd v. Velger,* 429 U.S. 624, 641, 97 S.Ct. 882, 891, 51 L.Ed.2d 92 (1977) (Stevens, J., dissenting).

Appellant served as a Reserve Commissioned Officer in the PHS. The statute governing the tenure of PHS officers provides that "[r]eserve commissions shall be for an indefinite period and may be terminated at any time, *as the President may direct.*" 42 U.S.C. § 209(a)(2) (emphasis added). The President has, in turn, delegated to the Secretary of HEW his authority to terminate reserve commissions and to prescribe regulations governing such terminations. Exec. Order No. 11,140, 3 C.F.R. 177 (1964–1965 Comp.), *reprinted in* 42 U.S.C. § 202 app. at 9533 (1970). While Reserve Officers could thus be said to serve "at the pleasure" of the President, Maj. Op. at —— of 183 U.S.App.D.C., at 709 of 562 F.2d, n. 23, the Executive Order makes clear that it is the President's "pleasure" that such offices be terminated only in accordance with the regulations promulgated by the Secretary of HEW. And it is, of course, well settled that an agency's own regulations are binding upon it,[1] and that regulations, as well as statutes, may give rise to a "property interest" in employment. *See, e. g., Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); and *Board of Regents v. Roth, supra.* Indeed, as the majority points out, Maj. Op. at

—— of 183 U.S.App.D.C., at 709 of 562 F.2d, n. 23, both *Roth* and *Perry* make clear that even *informal* "rules and understandings" may give rise to such an interest.

Accordingly, in order to determine whether Reserve Commissioned Officers of the PHS have a property interest in their employment, we must look to the PHS' personnel regulations, found at 42 C.F.R. § 21.1 *et seq.* and in the PHS "Commissioned Corps Personnel Manual." These regulations permit the "involuntary separation" of a Reserve Commissioned Officer in only three situations: 1) where the officer's performance is "marginal or substandard";[2] 2) where the officer has failed to be promoted within a specified period of time;[3] and 3) where the officer has been found guilty of one of a specified list of offenses (such as "willful disobedience," "negligence," "excessive use of drugs or intoxicating liquors," or the like).[4] It seems self-evident that separation in any of these three situations would constitute separation for "cause." And since this is the *only* kind of separation contemplated by the regulations, I conclude that Reserve Officers do have a protected "property interest" in their employment.

The majority's arguments to the contrary are unpersuasive. The majority quotes one paragraph from the "Commissioned Corps Personnel Manual"[5] and then concludes,

1. *See, e. g., Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959).

2. *See* Commissioned Corps Personnel Manual (Public Health Service), Sub-Chapter CC23.7 ("Separation"), Personnel Instruction 6 ("Involuntary Termination of Reserve Corps Officers' Commissions for Marginal or Sub-Standard Performance") [attached to this opinion as Appendix A]. Appellant was separated under the terms of this regulation.

3. *See id.,* Sub-Chapter 23.4a ("Promotion"), Personnel Guide 2 ("Failure of Permanent Promotion; Failure to Perform at Level of Temporary Grade").

4. *See* 42 C.F.R. § 21.261 *et seq.*

5. *See* Maj. Op. at ———— of 183 U.S.App. D.C., at 710 of 562 F.2d, n. 23. The paragraph quoted by the majority is found at § C.2. of Personnel Instruction 6. *See* n. 2 *supra.* This paragraph reads in full:

While the maintenance of high performance standards is essential, insistence on these standards will be combined with consideration of the officer. Continuing efforts will be made to assign officers where they can best demonstrate their capabilities. Ineffective performance in one assignment can be, but will not necessarily be, a basis for termination. An officer who is ineffective in one assignment will, where practicable, be given an opportunity to demonstrate improved performance in another assignment. Termination will be considered only after the officer fails to respond to positive efforts to provide him with an opportunity to demonstrate his capabilities.

apparently solely on the basis of that paragraph's alleged ambiguity, that "the PHS personnel regulations [do not give] rise to an implied promise that a reserve commissioned officer would only be terminated for 'cause'." Maj. Op. at —— of 183 U.S.App. D.C., at 710 of 562 F.2d, n. 23. However, when the paragraph in question is read in context, this conclusion is insupportable. This paragraph is contained within a section of the Personnel Manual entitled "Personnel INSTRUCTION 6—Involuntary Termination of Reserve Corps Officers' Commissions *for Marginal or Sub-Standard Performance*" (emphasis added). Section A.1 of this Instruction defines its "purpose and scope": "This instruction states the policy and procedures under which the commissions of Reserve Corps officers will be terminated, without their consent, *because of marginal or substandard performance.*" Section C. of the Instruction is entitled "policy". Subsection C.1. states flatly that "[l]ess than satisfactory performance will require termination of appointment." Subsection C.2.—the passage upon which the majority relies—merely indicates that this harsh *per se* rule should be tempered somewhat. This paragraph indicates that even where an individual's performance *has* been unsatisfactory, he need not necessarily be separated from the Service, at least in the first instance. The paragraph clearly does *not* suggest that an individual whose performance *has* been satisfactory may nonetheless be dismissed. Thus, § C.2. is fully consistent with the rest of "Personnel Instruction 6" and with the other regulations

governing the tenure of Reserve Commissioned Officers. Taken together, these regulations indicate that it is the policy of the PHS to dismiss such officers only for "cause"; moreover, even where "cause" is present, dismissal will not be automatic.

## II.

Having determined that appellant could only be dismissed for cause and that he was therefore entitled to the protections of due process, "the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Specifically, we must decide whether the procedures set forth in the PHS regulations satisfy the minimum requirements of the due process clause.[6] I conclude that they do not.

Under these regulations, an officer whose performance is considered "marginal or sub-standard" is entitled to notice of the fact that the Service is considering his dismissal and of the specific charges against him; he is then entitled to submit, in writing, his response to those charges. The charges, and the officer's response to them, are reviewed by an "Involuntary Separation Board," which then recommends to the Director of the Commissioned Personnel Operations Division whether the officer should be dismissed. The Director makes the "final determination;" if he decides that the officer should be dismissed, the officer is entitled to notice of the "specific basis" for this action. The officer may then request, in writing, that the Surgeon General (later

---

**6.** As noted *supra*, the majority has held, and I agree, that the PHS has failed to abide by the procedures set forth in its own regulations; this failure would require reversal here, whether or not those regulations satisfy the requirements of due process. In my view, however, we must nonetheless reach the constitutional issue, in order to determine the appropriate remedy in this case; in other words, we must decide what procedures are required by due process, so that we may specify what "process" is "due" appellant on remand.

Moreover, as the majority appears to concede, Maj. Op. at —— of 183 U.S.App.D.C., at 710 of 526 F.2d, n. 23, the fact that appellant's "property interest" in his job was, in effect, created by the PHS regulations does not mean

that those same regulations necessarily circumscribe the procedural protections to which appellant is entitled before he may be deprived of that "property interest." *See Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). "While the State may define what is and what is not property, once having defined those rights the Constitution defines due process, and as I understand it six members of the Court are in agreement on this fundamental proposition." *Id.* at 185, 94 S.Ct. at 1660 (White, J., concurring and dissenting). *Cf. Ring v. Schlesinger*, 164 U.S.App.D.C. 19, 502 F.2d 479 (1974), in which a panel of this court appears to adopt, at least in dicta, the position explicitly rejected by the majority in *Kennedy*.

changed to the Assistant Secretary for Health) review this "final determination."

In *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), the Supreme Court upheld the discharge of a non-probationary federal employee. The employee in *Kennedy* was entitled to pre-termination procedures similar to those described above. In addition, however, the employee in *Kennedy* was entitled to a *post*-termination trial-type, evidentiary hearing.

Six justices in *Kennedy* agreed that the employee in that case did have a "property interest" in his job; those six justices also agreed that "at some time" before such an individual is "finally deprived of his property interests," he is entitled to "some kind of hearing." 416 U.S. at 178, 94 S.Ct. 1633 (White, J., concurring and dissenting). Three of those justices concluded that this requirement was satisfied by a *post*-termination evidentiary hearing coupled with notice and an opportunity to present written responses to charges prior to termination; the other three of those justices, however, would have required an evidentiary hearing *prior* to the employee's termination. In other words, of the six justices in *Kennedy* who agreed that due process was implicated

by the employee's dismissal, all agreed that that employee was entitled to a trial-type evidentiary hearing, "at some time." They differed primarily about *when* such a hearing was required to be held.[7]

While the guidance provided by the five separate opinions in *Kennedy* may not be "altogether pellucid,"[8] I conclude that appellant here was entitled to a trial-type, evidentiary hearing "at some time"—*i. e.*, either before or after his termination.[9] Since the PHS regulations make no provision for such a hearing, they do not, in my view, satisfy the minimum requirements of due process.

As the Supreme Court has recently observed, one factor to be considered in determining what process is actually "due" in any given case is "the nature of the relevant inquiry." *Mathews v. Eldridge*, 424 U.S. 319, 343, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976). We must consider, in other words, the extent to which the more limited sort of hearing provided by the PHS regulation poses a "risk of an erroneous deprivation" of appellant's interests, and "the probable value, if any, of additional or substitute procedural safeguards . . . ." *Id.* at 335, 96 S.Ct. at 903.[10] In my view, the

7. The remaining three justices, in an opinion by Justice Rehnquist, concluded that whatever property interest Kennedy had in his employment "was itself conditioned by the procedural limitations which had accompanied the grant of that interest." 416 U.S. at 155, 94 S.Ct. at 1645.

8. Friendly, *Some Kind of Hearing*, 123 U.Pa.L. Rev. 1267 (1975).

9. *See Arnett v. Kennedy, supra*, 416 U.S. at 186, 94 S.Ct. at 1660 "[I]n my view a full hearing must be afforded at some juncture . . . ." (White, J., concurring and dissenting). While, in light of *Kennedy*, the government may provide such a "full hearing" *following* an employee's termination, it may not, of course, dispense with the more limited *pre*-termination procedures provided for by both the PHS regulations at issue here and by the statute at issue in *Kennedy*. A post-termination trial-type evidentiary hearing is required *in addition to*, not instead of, pre-termination notice and opportunity to respond to charges. *See Kennedy v. Robb*, 547 F.2d 408 (8th Cir. 1976), *pet. for cert. filed*, 45 U.S.L.W. 3622 (February 26, 1977).

10. The *Eldridge* opinion cites two other factors that should be considered in determining "the specific dictates of due process" in a given case: 1) "the private interest that will be affected by the official action;" and 2) "the Government's interest, including . . . the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335, 96 S.Ct. at 903. As the Court's discussion in *Eldridge* makes clear, these two factors are primarily relevant in determining "what process is due prior to the initial termination of benefits, pending review." *Id.* at 333, 96 S.Ct. at 902 (emphasis added). They may be less helpful in determining whether particular procedural protections are required *at all*, either before or after the initial termination of benefits. The issue in *Eldridge* was whether a recipient of Social Security disability benefits was entitled to an evidentiary hearing prior to the termination of such benefits. Since the relevant Social Security regulations provided for a *post*-termination evidentiary hearing, the issue of whether due process *required* such a hearing "at some time" did not arise in that case.

"nature of the . . . inquiry" in the present case makes an evidentiary hearing essential. At issue here is the *quality* of an individual employee's performance. Evaluations of the quality of someone's work are necessarily highly subjective. While such evaluations can, of course, be reduced to writing, testimonial evidence is likely to prove far more reliable; without the possibility of considering demeanor and credibility, the decisionmaker may lack any rational basis for resolving conflicts in opinion. Moreover, where, as here, the employee argues that the ostensible basis for his dismissal (*i. e.*, inadequate performance) is merely a cover, and that he is "really" being dismissed for other, illegitimate reasons (*i. e.*, his exercise of his First Amendment rights), cross-examination of the employee's superiors may offer the only means by which he could possibly prove his case. *Compare* Maj. Op. at —————— of 183 U.S.App.D.C., at 716–717 of 562 F.2d.[11]

Requiring an evidentiary hearing for employees in Mazaleski's position should not impose an undue burden on the government, especially if such hearings are provided after the employee's termination. Indeed, as our judgment in this case makes clear, providing an evidentiary hearing at the administrative level might actually save the government both time and money—obviously, if appellant had had the opportunity to raise his claims of improper dismissal in a trial-type evidentiary hearing at the administrative level, it is unlikely that he would have been entitled to a trial *de novo* of those claims in the district court. Accordingly, on remand I would direct the district court to remand this case to the agency, so that it could accord him the evidentiary hearing to which he is entitled under the due process clause.

## APPENDIX A

MANUAL: Personnel

Chapter Series CC—Commissioned Corps Personnel Manual

Part 2—Commissioned Corps Personnel Administration

## DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

Public Health Service

Chapter CC23—Staffing

Sub-Chapter CC23.7—Separation

Personnel INSTRUCTION 6—Involuntary Termination of Reserve Corps Officers' Commissions for Marginal or Sub-Standard Performance

*Section A. Purpose and Scope*

1. This Instruction states the policy and procedures under which the commissions of Reserve Corps officers will be terminated, without their consent, because of marginal or sub-standard performance.

2. The provisions of this Instruction apply only to Reserve Corps officers with less than 20 years of service. Officers with 20 or more years of service will be considered for involuntary retirement because of substandard performance under the provisions of Personnel Instruction 3, Sub-Chapter CC23.7.

---

11. The Court in *Eldridge* concluded that "the nature of the relevant inquiry" in a Social Security disability case made a pre-termination, trial-type hearing less necessary than in a welfare case. The Court noted that the decision to discontinue Social Security benefits depended primarily upon "a medical assessment of the worker's physical or mental condition . . . 424 U.S. at 343, 96 S.Ct. at 907. "This is a more sharply focused and easily documented decision than the typical determination of welfare entitlement. In the latter case, a wide variety of information may be deemed relevant, and issues of witness credibility and veracity often are critical to the decisionmaking process." *Id.* at 343–44, 96 S.Ct. at 907. The decision to dismiss an employee for "marginal or sub-standard" performance obviously has far more in common with this description of a welfare termination decision, than with a decision regarding the termination of disability benefits, which "will turn, in most cases, upon 'routine, standard, and unbiased medical reports by physician specialists.'" *Id.* at 344, 96 S.Ct. at 907 (citation omitted).

## Section B. Authority

Personnel Instruction 12, Chapter CC33, CCPM, delegates to the Surgeon General and Director, Commissioned Personnel Operations Division, the authority to terminate the commissions of Reserve Corps officers at any time.

## Section C. Policy

1. High performance requirements for all personnel of the Service are essential. Each officer is expected to accomplish his duties effectively and fulfill his responsibility in the conduct of Service programs. Less than satisfactory performance will require termination of appointment.

2. While the maintenance of high performance standards is essential, insistence on these standards will be combined with consideration of the officer. Continuing efforts will be made to assign officers where they can best demonstrate their capabilities. Ineffective performance in one assignment can be, but will not necessarily be, a basis for termination. An officer who is ineffective in one assignment will, where practicable, be given an opportunity to demonstrate improved performance in another assignment. Termination will be considered only after the officer fails to respond to positive efforts to provide him with an opportunity to demonstrate his capabilities.

 When an officer's performance is less than satisfactory, the immediate supervisor will be responsible for—

 a. discussing the performance with the officer in person,

 b. determining the reasons for the unsatisfactory performance, and

 c. doing everything possible to assist the officer to improve his performance.

 Discussion with the officer should not be delayed until an Efficiency and Progress Report is due. It should be held at any time appropriate and sufficiently in advance to give the officer an opportunity to improve his performance before the report is due. The supervisor will then discuss his evaluation of the officer when rating him at the time the regular annual Efficiency and Progress Report is due.

4. Accurate appraisal and reporting of an officer's performance is a basic requirement. It is imperative both to the officer and to the Service that reports be candid and objective since they are the basis for personnel actions involving assignment and promotion. While under-rating the officer may affect his career, over-rating is of dubious benefit to him since it may lead to assignment and promotion with responsibilities for which he is not, in fact, qualified, thus resulting in adverse action.

## Section D. Sub-Standard Performance

1. Sub-standard performance which requires consideration for termination includes any one of the following or similar conditions:

 a. Downward trend in overall performance resulting in an unacceptable record or a consistent record of sub-standard service.

 b. Failure to keep pace or progress with contemporaries (Example: Repeated failure to be recommended for promotion or assimilation into Regular Corps.)

 c. Failure to discharge properly assignments commensurate with his grade and experience.

 d. Attitudes or characteristics indicating inability or unwillingness to expend effort or to function in typical work situations commensurate with officer's grade.

## Section E. Initiating Action

1. Operating programs will be primarily responsible for initiating action when an officer's performance is considered inadequate. Recommendations for termination of commission will be made to the Director, Commissioned Personnel

Operations Division by the appropriate Agency Head, giving specific reason(s) and shall include all pertinent supporting facts, including but not limited to the following:

a. Summary of all past and current discussions with the officer and his superiors concerning the officer's performance.

b. Statement regarding action to place officer in suitable assignment.

c. Current evaluation by superiors of the officer's performance in his present assignment, including whether the responsibilities are or are not in line with the grade held.

2. Officers whose performance is considered inadequate will also be identified by the Commissioned Personnel Operations Division for possible consideration for termination based on (a) review of officer's Efficiency and Progress Reports, and (b) recommendations of Promotion Boards when the officer fails to be recommended for promotion or assimilation into the Regular Corps.

When identified by the Commissioned Personnel Operations Division, the case will be referred to the appropriate Agency Head for review and report of findings and recommendations. Such referral will not necessarily be to precipitate adverse action but to determine what other course of action, if any, can be taken. No officer will be considered for termination until all the facts to make such a determination are obtained and reviewed. The Agency's review and any discussions with the officer will be made with this understanding.

Report and recommendation of the Agencies will give specific reasons and be supported with reports listed in paragraph 1 of this Section. These reports will be submitted whether or not the Agency recommends termination.

### Section F. Review and Board Referral

1. Recommendations submitted by the Agencies will be reviewed by the Di-

rector, Commissioned Personnel Operations Division. If the facts indicate that termination should be considered, the case will be referred to an Involuntary Separation Board (see Section G). The Director, Commissioned Personnel Operations Division, will notify the officer, through channels, giving specific reason(s) for the referral. At this time, the officer may—

a. Enter into the record any pertinent facts or statement on his behalf for consideration by the Board; or

b. Resign.

### Section G. Board Review

1. Involuntary Separation Boards will be appointed and convened by the Director, Commissioned Personnel Operations Division, as the need occurs. Such Boards will consist of at least three senior officers, if possible, of the same profession or category as the officer being considered for separation. No board member will be part of the administrative line which considered the case in the review by the Agency.

2. Board recommendations will be based on the material in the records submitted to them for review and any other material which each Board may find necessary to add to the record to supplement or clarify previous notations in the record. Upon conclusion of its review, the Board will submit a report to the Director, Commissioned Personnel Operations Division, stating the issues, the findings of fact, and recommendations to—

a. terminate the officer's commission, or

b. continue officer on active duty (with or without reassignment, including demotion if officer is holding temporary grade).

### Section H. Action Following Board Review

1. Upon receipt and consideration of the Board's report and recommendation, the

Director, Commissioned Personnel Operations Division, will make the final determination and notify the officer of the decision. Notice to the officer will be transmitted to the Agency Head for delivery to the officer by an appropriate official who will obtain and forward to the Director, Commissioned Personnel Operations Division, the officer's written acknowledgement of its receipt.

2. If the decision is to terminate the officer's commission, notice to the officer will include the specific basis for the action, and the date of termination (as determined between the Commissioned Personnel Operations Division and the program). To the extent possible and justified by the circumstances, the date of termination will be determined to give the officer a reasonable period within which to formulate plans.

*Section I. Review by the Surgeon General*

1. An officer may request a review by the Surgeon General of the decision to terminate his commission. Request must be made within 10 days from the date the officer receives notice of the decision.

2. Request for review will be made in writing giving reasons as to why he should be continued on active duty.

3. The Surgeon General's decision will be final.

DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE T.S.
PRS–CC 162 8/14/69